CRISWELL, Plaintiff and Respondent, vs. SEAMAN BODY CORPORATION, imp., Defendant and Appellant: PERMANENT CONSTRUCTION COMPANY, Interpleaded Defendant and Respondent.

*January 17—February 13, 1940.*

608

For the appellant there were briefs by *Quarles, Spence &*
*Quarles,* attorneys, and *Kenneth P. Grubb* and *Henry S.*
*Reuss* of counsel, all of Milwaukee, and oral argument by
*Mr. Grubb* and *Mr. Reuss.*

*Gerald Powers* and *A. J. Engelhard,* both of Milwaukee,
for the respondent Charles Criswell.

*James E. Coleman* of Milwaukee, for the interpleaded re-
spondent Permanent Construction Company.

FRITZ, J.    The plaintiff, Criswell, sued the defendant and
appellant, Seaman, and the Electric Company to recover dam-
ages for injuries sustained by him upon receiving an electric
shock on September 28, 1936, while working as one of a

crew employed by Worden in erecting structural steel as a
subcontractor under Permanent, which as the general con-
tractor was constructing a crane-runway building for Sea-
man on premises owned and used by it as a manufacturing
plant in which it employed many men. Criswell received the
shock when a metal cable, which extended from the boom
of a derrick used by Worden's crew in erecting an iron col-
umn for the building either came in contact with one of the
uninsulated wires of a power line, or an arc formed between
the wire and the cable as Criswell's hand touched the column
while he stood on the ground performing his duties in con-
nection with erecting the column on a concrete footing con-
structed theretofore by Permanent. Plaintiff's action is
predicated upon alleged violations of the safe-place statute
and negligence on the part of Seaman and the Electric Com-
pany in the installation and maintenance of the wires upon
Seaman's premises. Upon the trial the court directed a ver-
dict in favor of the Electric Company, and submitted ques-
tions to the jury for a special verdict in relation to alleged
causal violations by Seaman of the safe-place statute, con-
tributory negligence on the part of Criswell, comparative
negligence, and the assessment of Criswell's damages for loss
of earnings and pain and suffering.

The jury found that Seaman failed to maintain the place
where Worden's employees were erecting the column as free
from danger to the life and safety of the employees as the
nature of their employment and their place of employment
would reasonably permit; that Seaman by the exercise of
reasonable diligence ought to have known before the acci-
dent and in time to take adequate steps to prevent the same
that the equipment used by Worden might probably be used
by its employees in erecting that column, and used by them
in such a manner as to make it likely that some part of the
equipment would come in contact with or dangerously close
to the electric-power wires; that Seaman failed prior to the
accident to adopt and use methods or measures reasonably

adequate to render the place where Worden's employees were engaging in erecting the column as free from danger as the nature of their employment and place of employment would reasonably permit, and such failure was an efficient cause of plaintiff's injury; that plaintiff was not negligent in directing the boom operator as to the movement of the boom, or in coming in contact with the column at a time when the cable holding the column came dangerously close to the electric wiring; and that his damages were $2,250 for loss of earnings and $2,200 for pain and suffering. In passing upon the motions after verdict, the court approved these findings. They are challenged on Seaman's appeal, particularly in so far as the jury found that there was no contributory negligence on Criswell's part and that his damages amounted to $2,250 for loss of earnings and $2,200 for pain and suffering. However, upon reviewing the record we find that the evidence warranted the court's approval of the jury's findings. The material facts in support thereof and which the evidence fairly admits finding will be hereinafter stated in so far as necessary to pass upon Seaman's other contentions on this appeal.

Seaman's principal contention is that it is not liable under the safe-place statute because (a) it did not own, maintain, or have any right of control over the electric-power line and had called in and consulted representatives of the Electric Company, which was the owner thereof and the only party in the vicinity equipped or competent to take care of high-tension lines; (b) Seaman was not engaged in or equipped for the construction trade, and therefore let to Permanent, a general construction contractor, the contract for the construction of the addition to its factory; (c) and Seaman did not own, control, or select the equipment used by Permanent or its subcontractor Worden, and it had no right of control over the operations of either of them or of the details of the work, excepting to have the completed build-

ing delivered in accordance with the plans and specifications, and have Tinker, who was its only representative, check to see whether the building was erected in accordance therewith. In passing upon the contention which is based on these grounds, there must be taken into consideration the following additional facts, which can reasonably be deemed established by the evidence.

At Seaman's request the new building was designed for it by Permanent, which was awarded the general contract for the construction thereof on Seaman's land on which it had its manufacturing plant, and with its knowledge, Permanent sublet to Worden the erection of the structural steel. At the crest of the roof of the new building it was to be approximately forty-two and one-half feet above the ground, and the construction of the steel frame thereof required the erection by Worden, along the lines of its north and south walls, of two parallel rows, fifty-five feet apart, of seven iron columns twenty-eight and one-half feet long, the base of which had to be placed at the ground level upon concrete footings theretofore installed by Permanent. On the top of the columns Worden had to install triangular iron roof trusses with the apex thereof forty-two and one-half feet above the ground level, and also install iron crossbeams, braces, etc., between each pair of trusses. Consequently, in order to hoist the structural steel and have the clearance necessary for moving it into place at the highest points, Worden had to use hoisting apparatus of sufficient size to allow the necessary clearance over the apex of an installed truss. For that purpose Worden provided and its crew used, in erecting the structural steel on several days prior to the accident in question, a derrick with a forty-feet boom, the base of which was on a truck at a height of five and one-half feet above the normal pavement.

The south wall of the new building was to be on a line on which there was a wooden pole carrying the power line

erected by the Electric Company on Seaman's land pursuant to a contract between them for the furnishing of electric current to Seaman. It had in its employment one Tinker, as its plant-maintenance engineer to look after the physical condition of its premises, and under his jurisdiction it employed Frank J. Effland, as its director of maintenance and purchases, and Wm. W. Janzer, as its safety director. Before the construction of the south wall was commenced, Effland, as 'Seaman's representative, notified the Electric Company of the projected building by speaking to the latter's sales engineer, Almer Skretting. He had Peter Urfer, a practicing electrical engineer for the Electric Company, accompany him to the Seaman plant on September 3d, where they conferred with Effland or Tinker. Urfer proposed using a pole forty-five feet long which had to be set into the ground, but Seaman's representative thought a higher pole should be used. Thereupon Urfer had a fifty-feet pole put in on September 5th, and on September 9th Skretting checked the change to see that it was done satisfactorily. That new pole was erected six to seven feet west of where the steel column was to be erected, which was being put in place when plaintiff was injured; and the new pole was set approximately fifteen to twenty-four inches south of the line of the south wall of the projected building. The clearance of the wires on the lower of its two crossarms was approximately forty-one feet above the ground level, but that clearance was somewhat diminished as the wire extended eastward because the crossarm was lower on the next pole to the east, which was only a forty-five-feet pole. The three bare copper wires on each crossarm carried approximately thirteen thousand volts under a sixty-cycle frequency. Tinker several times a day observed the work of the Worden crew as the construction progressed, and also the type of derrick and boom which the crew was constantly using. Effland and Janzer also saw the derrick and boom in use by the crew, while the roof trusses were being installed. None of them did anything to

have the power wires relocated or the power shut off, or the boom changed.

However, either some days before Criswell was injured on the morning of Monday, September 28th, or prior to his injury on that morning, there was a conversation between Sharkey, who was the foreman in charge of the Worden crew, and Tinker in relation to the danger because of the heavily charged power wires, which Sharkey said were too low for the work that was to be done in erecting the columns along the south wall. Tinker replied that the wires would be raised over the week end. There is some confusion in the evidence as to whether that conversation was held on the Friday preceding the Monday morning on which Criswell was injured, or early that morning, but it was within the province of the jury to conclude, as did the court, that it occurred on the preceding Friday. The wires had not been raised, however, when, on September 28th, the Worden crew, including Sharkey and Criswell, first installed the connecting steel between trusses placed on columns theretofore erected. After that was done Criswell, who knew that the next column to be erected was along the south wall, walked to the south side of a wire fence eight feet high, which ran east and west two feet north of the concrete footing upon which that column was to be placed, and he removed the nuts on the bolts in that footing so that the column could be set over them and fastened on the pier. While he was so engaged, the crew moved the column to the north of the fence and prepared it for hoisting over the fence. A tag rope was fastened to the column where there was a chain around it so that it could be attached to a cable lowered from the boom. The column was hoisted in a horizontal position across the fence pursuant to signals given by Criswell to Sharkey, who in turn signaled the operator of the derrick. But after the column was south of the fence, Sharkey signaled to the operator to lower the boom without being given any signal by Criswell. While the column was being lowered

Sharkey and Criswell watched the cable by which it was hanging. Criswell knew that the cable should not touch the wires, but neither he nor Sharkey knew that electric current could be transmitted when there was not as yet an actual contact between a wire and the cable. While the upper end of the boom was still above the horizontal level of the nearest power wire, and the cable was a distance of one and one-half to two feet from the wire according to Sharkey, or there was still a clearance of three or four feet, according to Criswell, his left hand touched the column while he was busy in relation to the handling of the column and reaching for the tag rope, which had been thrown over the fence when the column was moved across it. While Criswell was in that position there was a flash, and he received an electric shock, as the result of which he was badly burned and thrown away from the footing. The evidence does not show that there was an actual contact between the wire and the cable. Criswell and Sharkey testified that there was none to their knowledge. There was however evidence which admitted finding (a) that under the existing conditions, with the ground wet and the air moist and fog-like, an arc can form between a high-tension electric wire and a metal cable when grounded by a human being; and (b) that, whether the current was transmitted by an actual contact or over an arc which formed between the wire and the cable, the proximity of the wire to the cable, when the latter was in the situation in which it was being used at the time of the accident, and the failure to adopt and use methods or measures reasonably adequate to render the place where employees were obliged to be as free from danger as the nature and the place of their employment would reasonably permit, constituted an efficient cause of the shock and injury sustained by Criswell.

The evidence establishes conclusively that at all of the times in question Seaman was the owner and had custody, control, and possession of the entire premises upon which the power line and the building under construction were located,

and was using the premises as a place of employment for its employees. Consequently, these premises were a "place of employment" under the definition of that term in sec. 101.01 (1), Stats.; and Seaman was an "employer" within the definition of that term in sec. 101.01 (3), Stats., and also an "owner" as defined in sec. 101.01 (13), Stats. As such an employer and owner in possession, custody, and control of a place of employment, it was its duty to furnish safe employment and a safe place of employment, and furnish and use safety devices and safeguards and methods as required by the provisions in sec. 101.06, Stats., that,—

"Every employer shall furnish employment which shall be safe for the employees therein and shall furnish a place of employment which shall be safe for employees therein and for frequenters thereof and shall furnish and use safety devices and safeguards, and shall adopt and use methods and processes reasonably adequate to render such employment and places of employment safe, and shall do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employees and frequenters. . . ."

Although the Electric Company continued to be the owner of the power line, that fact did not prevent Seaman from exercising its rights and powers of controlling and having necessary changes made by the Electric Company in the location and height of its poles and wires, and the clearance of the latter for safety purposes. In these respects and for that purpose, Seaman had sufficient control over the power line upon its premises to have the Electric Company either relocate the wires or shut off the electric current during hoisting operations which were rendered dangerous by the proximity of the wires to the cable in question; and that Seaman had this right to control was freely recognized and is evidenced by the prompt response of the Electric Company when it was requested by Seaman's representative to increase the clearance by using a pole five feet longer than was first proposed by the Electric Company's engineer. Likewise, when Seaman let the general contract to Permanent and it in turn

engaged Worden as the subcontractor to erect the structural steel, Seaman neither relinquished its rights of possession and control of its premises nor could it while continuing in possession and control thereof delegate to either Permanent or Worden, so as to absolve itself therefrom, its duty and obligation under sec. 101.06, Stats., to furnish for employees and frequenters the safe place of employment, safety devices, safeguards, and methods and every other thing required by that statute. Although Seaman did not own, select, or control the equipment used by Worden or control the operations of Worden's crew, the former was charged with the knowledge that in order to erect the structural steel as required for the building, some of it had to be raised over forty-two and one-half feet above the ground, and there was evidence which admitted finding that Seaman's representatives, Tinker and Janzer, saw the boom which had to be used for that purpose and was in actual use up to the time of the accident, and that they knew of the danger because of the proximity of the high-tension wires to the cable used in the construction operations. The proof in respect to these facts and circumstances warranted the jury's findings in answers to questions Nos. 2 and 3 of the verdict that Seaman had actual and constructive knowledge, in time to have prevented the accident, that the derrick and boom of the type and dimensions used at the time thereof might probably be used by the crew in such manner as to make it likely that some metallic part of the equipment might come in contact with or dangerously close to the high-tension wires. Consequently, it was Seaman's duty under the safe-place statute either to have the wires relocated so as to remove the danger of a contact or the formation of an electric arc between a wire and the cable, or to have the current shut off while the boom had to be operated so close to where the wires were placed with Seaman's knowledge and consent. Having knowledge of the dangerous condition and having the right and power to remedy it,

Seaman became liable for injury caused by its failure to furnish and maintain a safe place of employment in compliance with sec. 101.06, Stats. *Neitzke v. Kraft-Phenix Dairies, Inc.,* 214 Wis. 441, 447, 253 N. W. 579; *Sandeen v. Willow River Power Co.* 214 Wis. 166, 175, 176, 252 N. W. 706; *Waskow v. Robert L. Reisinger & Co.* 180 Wis. 537, 193 N. W. 357.

Seaman also contends that Criswell was not entitled to recover from it because his injuries were caused by concurrent negligence of his employer Worden,—which was an independent contractor,—and it was not contemplated under the compensation act to allow an employee to recover under sec. 102.29, Stats., from another tort-feasor when the employer's negligence was also a cause of the employee's injury. The contention cannot be sustained. Negligence on the part of Worden does not defeat Seaman's liability to Criswell as a frequenter by reason of its failure to comply with the safe-place statute. *Neitzke v. Kraft-Phenix Dairies, Inc., supra; Sandeen v. Willow River Power Co., supra; Kuske v. Miller Brothers Co.* 227 Wis. 300, 277 N. W. 619. Neither does such negligence on the part of the employer Worden render it liable to Seaman for contribution upon its payment of damages to Criswell. As Worden's liability as an employer under the compensation act is in lieu of any tort liability on its part, there is no common liability in tort as between Worden and Seaman, even though concurrent torts on their part caused Criswell's injury. *Buggs v. Wolff,* 201 Wis. 533, 230 N. W. 621.

Seaman further contends it is not liable for Criswell's injury because Worden's negligence in proceeding with the erection of the column, while aware of the danger because of the proximity of the wires and in permitting the cable to come in dangerous proximity thereto, was such an intervening cause that Seaman's violation of the safe-place statute was not a proximate cause. This contention cannot be sus-

tained because the evidence admitted finding that, in view of Seaman's knowledge of Worden's operations in proceeding with the erection of the fifth column on the morning in question, Worden's negligence in that respect could and ought to have been foreseen by Seaman in the exercise of reasonable care. Under these circumstances, the negligence on the part of Worden was not such an independent intervening cause that Seaman's failure to comply with the safe-place statute cannot be held to be a proximate cause. *Sandeen v. Willow River Power Co., supra.* In passing upon the same contention, under analogous circumstances in that case, we said,—

"Defendant contends that the moving of the derrick by Johnson's crew constituted such an independent intervening cause of the injuries that defendant's failure to furnish and maintain a place of employment in compliance with the safe-place statute, and to give due warning of existing dangers, cannot be held to be proximate causes of the injuries. Although the moving of the derrick was an intervening act, which was done voluntarily by Johnson's crew without directions by defendant, it was nevertheless an act which the jury could reasonably find could have been foreseen by the defendant in the exercise of reasonable care, because the evidence admitted of the following inferences: . . . As, under the circumstances, it cannot be held that the intervening act could not have been foreseen by the defendant, and one of the essential conditions, in order to absolve a wrongdoer from liability for his negligence because an independent cause intervenes, is that resulting injury could not have been foreseen by the exercise of reasonable diligence on the part of the wrongdoer [citations], it would be error to hold that the injuries sustained were, as a matter of law, so remote that defendant's failures cannot be held to be proximate causes thereof." See also *Neitzke v. Kraft-Phenix Dairies, Inc., supra.*

Seaman further contends that there was contributory negligence on the part of Criswell and that his injury was attributable thereto to a greater extent than it was to Seaman's failure to comply with the requirements of the safe-place

statute. The issues in respect to plaintiff's contributory neg-ligence were properly submitted to the jury by questions which were in substantially the form of questions requested by Seaman. In answer thereto the jury found that Criswell was not negligent either in respect to directing the boom operator as to the movement of the boom or in respect to coming in contact with the column at a time when the cable holding it was dangerously close to the electric wire. These findings were warranted by evidence which clearly estab-lished in some respects, and in others reasonably admitted of inferences as to the existence of the following facts and cir-cumstances, to wit: The flash at the time Criswell received the shock occurred when an arc formed while the cable was still away from the wire and there was no physical contact between them. From the time the column attained a vertical position after it was moved across the fence, Sharkey alone gave signals to the operator of the boom, without paying attention to any signal by Criswell. While he was watching the boom operations and signaling to Sharkey, Criswell exer-cised due care in watching that the cable did not "hit" the electric wire. His duties required him to look intermittently up to the wires and down to the footing as the boom was lowering the column closer to the footing. His object in looking up was to make sure that the cable did not hit the wire, and to him it did not appear unsafe for his hand to touch the column, while no contact between the cable and the wire was noticeable to him or to Sharkey. Moreover, there was no evidence that Criswell ought to have known or as-sumed that an arc would form between the wire and the cable. Likewise, there was no proof of anything to indicate to him that the boom moved toward the wire between the time he made his last observation of the wires before the flash, and the time he looked at the footing to see how close the column was to it. The jury could reasonably believe un-der the evidence that Criswell was not aware of any danger

to him by touching the column, so long as the cable and wire were not in contact, and that it was not obvious to him that the cable was dangerously near the wire at the time he made his last observation, which was practically concurrent with the touching of the column. Under the circumstances, the evidence admitted finding that there was such momentary diversion of attention or preoccupation in Criswell's performance of the work which he was required to do as to minimize the degree of care which otherwise would be required in the absence of such diversion or preoccupancy, and that therefore it was within the province of the jury to find that he was not guilty of causal negligence by reason of his hand coming in contact with the column at the time he received the shock. As this court said in *Hodgson v. Wisconsin Gas & E. Co.* 188 Wis. 341, 344, 206 N. W. 191,—

"A momentary diversion of attention, or preoccupation in the discharge of duties, minimizes the degree of care required in the absence of such diversion or preoccupation. [Citations.] The doctrine of these cases may be thus stated: Such diversion or preoccupation so far excuses the exercise of that degree of care ordinarily required as to make it a jury question whether the plaintiff's conduct under the actual circumstances constitutes ordinary care."

Furthermore, it is contended by Seaman that if Criswell is entitled to judgment herein for the recovery of his damages from Seaman, it is entitled to indemnity from Permanent. The contention is based on the argument that if it is held liable as an "owner" in control of the premises, then Permanent, as the general contractor, acquired control and custody by virtue of its contract of all of that entire part of Seaman's land which was devoted to the construction of the new building; that Permanent prepared the plans for the construction thereof as a place of employment, and had, as between it and Seaman, the actual control and custody of the construction, choice of and control over the methods, means, and operations, and also had, through its chosen instrumentality Wor-

den actual ownership, choice of, control, and custody of the derrick, boom, and other equipment used for erecting the building; and that therefore, in at least three senses, Permanent became "owner" of the "place of employment" under the definition of "owner" in sec. 101.01 (13), Stats. It is true that by virtue of the contract between Seaman and Permanent for the construction of the building and the latter's subcontract with Worden, each of them was licensed in effect to have its respective employees enter and work upon Seaman's premises in so far as necessary for each to perform work which it had contracted to do. Nevertheless, Seaman continued in fact to have the ownership and the actual possession, custody, use, and control of its entire premises at all times, and it actually exercised its rights in each of those respects by having its representatives arrange with the Electric Company for the relocation of a pole and wires, and confer with the latter's engineers as to the extent and manner of the change, and also having Tinker inspect and check the work as it was being done by the contractors in erecting the new building. On the other hand, it does not appear that Permanent in fact had the custody or control of the place of Criswell's employment or supervision over his work at the time Worden's crew was erecting the structural steel. J. C. Thielacker, who acted as Worden's superintendent, testified that he was in charge of its erection of the steel, and that Permanent had no right or authority to give any orders or to direct any part of the work which was being done by the crew working under his foreman Sharkey. Moreover, under the testimony of A. P. Schupmehl, a representative of the Electric Company, that it would cut off the power line only after first arranging for the outage with the customer, it is evident that under its contract for furnishing electricity to Seaman, the Electric Company would not do anything in regard to cutting off the current to its plant without first obtaining its consent, and consequently Permanent could not control the flow of electric current or the relocation of the

wires upon Seaman's premises. As the learned circuit judge stated in passing upon the contention under consideration,—

"The location and height of the electric-power pole, the height of the wires and the voltage made the place a perilous one to work in. A place thus fraught with danger was turned over to the Permanent Construction Company by the Seaman Corporation. . . . The Permanent Construction Company could rightly enter into a contract with the Worden-Allen Company to erect the steel work—as it did. In doing so the actual control as well as the right of control of all details of the work were properly delegated to the Worden-Allen Company as an independent contractor. The Permanent Construction Company in such case is not liable for injuries caused by the use of certain equipment, unfitted to the premises, because of the danger from high-tension wires. *Kolb v. Hayes,* 194 Wis. 40; *Menge v. Manthey,* 200 Wis. 485, 490. But if, as the work progressed, the owner—controlling the location, height and the use of the wires—obtained knowledge of the fact that by means of the equipment and the methods employed the boom or cable was brought dangerously close to the charged wires, then a duty arose on the part of the Seaman Corporation to take adequate precautions to protect the workmen. . . . While it appeared beyond dispute that the Seaman Corporation had actual knowledge of the equipment used, the method of operation, and the danger to the workmen, there was no showing of such knowledge, actual or constructive, on the part of the Permanent Construction Company. Thus we have a situation where control of the ultimate source of the danger was in the Seaman Corporation—while control as to the details of the equipment and the work was in the Worden-Allen Company. . . . In the instant case there is no active negligence on the part of the Permanent Construction Company—certainly no 'element of culpability'—no 'real delinquency'—such as to make that company primarily responsible for the plaintiff's injury. My conclusion therefore is that there can be no recovery of indemnity on the part of the Seaman Corporation against the Permanent Construction Company."

The contention of Seaman that the awards of $2,250 as damages for plaintiff's loss of earnings, and $2,200 as damages for his pain and suffering, are excessive likewise cannot

be sustained. There is evidence, which could be considered credible by the jury, that plaintiff sustained burns on the fingers and palm of his left hand, and also on both feet, some of which were deep, third-degree burns because of which flesh had to be cut away from day to day, and skin had to be grafted which was taken from his thigh. He was kept thirty-two days in the hospital and was obliged to use crutches eight weeks thereafter. He tried to work in January, 1937, but had to quit because of lack of strength in his left hand and arm. At the time of the trial in February, 1939, his hand and arm were still weak and the left foot was still tender. He was very nervous and irritable and had headaches and dizzy spells. There was testimony by physicians that in all probability the electric traumatism precipitated a nervous disorder and Criswell was suffering from hyperesthesia of the left hand and left foot; that his complaints would persist and probably go on indefinitely; and that such cases were known to be sensitive for four, five, or six years, and sensitive to pressure especially during the change to cold weather. His loss of earnings was $819 for the first seventeen weeks and since then his earning capacity has been materially affected because up to the time of the trial he could not handle the tools of a structural steel worker or safely work above the ground level; was incapable of operating a pneumatic riveting hammer or bucking bar, and, therefore, was not available for that kind of work; was unable to climb as structural steel workers must; and his nervous condition, excitability, and lack of concentration caused the foreman to find him unreliable for work above the ground. In view of these consequences and conditions as the result of the accident, the trial court did not err in concluding that the jury's assessment of damages was not excessive. Neither is there any prejudicial error in any of the other respects assigned by the appellant.

*By the Court.*—Judgment affirmed.