Saxhaug and another, Respondents, vs. Forsyth Leather Company, Appellant.*

*February 19—March 29, 1948.*

* Motion for rehearing denied, with $25 costs, on May 25, 1948.

378

380

For the appellant there were briefs by *Lines, Spooner &* *Quarles,* attorneys, and *Charles B. Quarles* and *Howard A.* *Hartman* of counsel, all of Milwaukee, and oral argument by *Mr. Hartman* and *Mr. Quarles.*

For the respondents there was a brief by *Otjen & Otjen* of Milwaukee, and oral argument by *Henry J. Otjen* and *C. J.* *Otjen.*

FAIRCHILD, J.    The first question to be answered is whether the release executed by the widow to Schlitz extinguished her right to be here allowed recovery against the appellant.    To support the contention that it did, appellant cites cases in which this court has held that a release given by an injured party to one of several wrongdoers releases all and is a bar to an action against those not named in the release.    *Ellis v. Esson* (1880), 50 Wis. 138, 6 N. W. 518; *Retelle v. Sullivan* (1927), 191 Wis. 576, 578, 211 N. W. 756.    In the *Retelle*

*Case* the injured party brought suit against a doctor to recover for damages sustained through alleged malpractice. He had already received compensation from the owner of the building in which the accident occurred and had released the owner and his insurer "from all actions, causes of action and demands of every kind and nature which I now have, claim to have, or may hereafter claim to have against either or both of them arising out of or on account of said injury. . . ." The court pointed out that the damages, if any, resulting from unskilful medical treatment were a proper element of the damages which the injured party might have recovered from the owner of the premises on which the injury occurred. The release of the owner and his insurance carrier, consequently left the injured with no further claim against the physician.

The case with which we are dealing here is quite different. On the one hand there is the fact that the safe-place statute, sec. 101.06, Stats. 1941, imposes an absolute duty upon the owner of the building, as well as the employer, of furnishing a place as safe as the nature of the employment will reasonably permit. *Rosholt v. Worden-Allen Co.* (1913) 155 Wis. 168, 144 N. W. 650; *Olson v. Whitney Bros. Co.* (1915) 160 Wis. 606, 150 N. W. 959; *Washburn v. Skogg* (1931), 204 Wis. 29, 233 N. W. 764; 235 N. W. 437; *Mullen v. Larson-Morgan Co.* (1933) 212 Wis. 52, 249 N. W. 67. But on the other hand there is the statutory provision of the Workmen's Compensation Law which specifically limits the liability of the employer. Sec. 102.03 (2), Stats. 1941, provides, "Where such conditions exist the right to the recovery of compensation pursuant to the provisions of this chapter shall be the exclusive remedy against the employer."

It is thus clear that the employer's exclusive liability is for compensation under the Workmen's Compensation Act. His failure to maintain or meet certain safety standards could only increase the amount of workmen's compensation to be paid, as prescribed by sec. 102.57, Stats. 1941. It could not create

a tort liability. Typical of the language used by this court in other cases in which the provision relieving the employer of any other liability has been applied is that in *Buggs v. Wolff* (1930), 201 Wis. 533, 536, 230 N. W. 621, and in *Clark v. Chicago, M., St. P. & P. R. Co.* (1934) 214 Wis. 295, 304, 252 N. W. 685. In the *Buggs Case* it was said, "It will be seen that Buggs having been subjected to the liability of the compensation act, such liability was in lieu of any other liability whatsoever." In the *Clark Case* the court said, "The telephone company sustained no tort liability to its workmen or to their dependents by reason of its employees' negligence."

In *Anderson v. Miller Scrap Iron Co.* (1919) 169 Wis. 106, 110, 170 N. W. 275, 171 N. W. 935, the liability of an employer, as changed from common-law liability by the Workmen's Compensation Act, was discussed in these words:

"It is true that the liability of the employer at common law was that of a wrongdoer and therefore tortious in its nature. It is also true that for that liability the Workmen's Compensation Act has substituted another liability. It does not necessarily follow, however, that the principles applicable to torts should be applied to the liabilities of the employer under the act. The liability of the employer under the act is not based upon any wrongful conduct or negligent act of the employer. However blameless the employer may be, he is nevertheless liable if the employee be injured and he bring himself within the terms of the act.

"The liability of the employer under the Workmen's Compensation Act is not only one of an entirely different nature, but it is based upon a wholly different economic theory. . . ."

The Massachusetts court, in considering that state's Workmen's Compensation Act, aptly described the effect of such a law as follows:

"The rights of the employee under the act rest neither in negligence nor contract. They arise wholly out of the Workmen's Compensation Act. That act establishes a status for those subject to its provisions from which flow certain obligations and rights for employer, employee and insurer. Those

obligations and rights, so far as the employee is concerned, are susceptible of enforcement exclusively through the procedure set forth in the act. That procedure is direct and flexible but peculiar to the act. It is neither an action at law nor a suit in equity." *Devine's Case* (1921), 236 Mass. 588, 593, 129 N. E. 414. See *Simon v. Strock* (1946), 209 S. C. 134, 39 S. E. (2d) 209.

Because the employer's liability is determinable exclusively under the Workmen's Compensation Law, Schlitz' liability is entirely separate from the appellant's liability in tort. The liability resting on Schlitz does not arise out of and is in no legal sense connected with or related to the liability of the appellant for its failure to meet the requirements of the safe-place statute. That being true, the circuit court's refusal to consider a release to Schlitz as of any advantage to appellant was correct. The adjustment between the employer and the dependents of the employee, which could relate only to obligations and rights created by the Workmen's Compensation Act, can neither add to nor subtract from the dependents' claim for wrongful death against a third party who may be liable in tort. Under sec. 102.29 (1) (b), Stats. 1941, the right of the employee to bring an action against a third party is not affected by his receiving compensation from the employer. The statute subrogates the employer to a part at least of the rights of the employee against the third party who is liable in tort for the damage for which the employer must pay the amounts fixed by the law that governs the employer-employee status.

Appellant relies on language used in *Hooyman v. Reeve* (1919), 168 Wis. 420, 170 N. W. 282. In that case a release given to an employer was held to bar a subsequent action against a doctor for malpractice. As the law stood at the time that cause of action arose in 1912, the total injury was chargeable to the employer. Ch. 624, Laws of 1917, changed that rule (see sec. 102.29 (4), Stats. 1941) "to restore to an injured employee the right to collect damages from a physician who has treated him unskilfully." Bulletin of Industrial

Commission of Wisconsin, September 1, 1917, p. 34. While the rule of the *Hooyman Case* has thus been changed by legislation, the acts of appellant here stand in no such relation to the liability of Schlitz as the act of the doctor did to the liability of the employer in the *Hooyman Case* under the law as it then stood. "There the damages sustained by the acts of the doctor were connected with the employer's liability. As in the *Retelle Case,* they were a part of the damages recoverable from the party released. Not so here. The appellant's liability under the safe-place statute could not be a part of the employer's limited liability under the Workmen's Compensation Act. The damages caused by the appellant's tort were not a part of the damages recoverable from the employer.

In some situations courts have held that the intent of the parties determines whether the release of one wrongdoer also releases another. See *Ellis v. Esson* (1880), 50 Wis. 138, 6 N. W. 518; 23 R. C. L., Release, pp. 405–407, secs. 35, 36. Although no act of the respondent could so change things as to put the employer in the classification of tort-feasor, the language of the release in this case does not evince an intention by her to do so or to relinquish her claim against the appellant. In signing a receipt acknowledging the provision made for her she did not purport to accept the annuity from Schlitz in full satisfaction of whatever claim she might have arising out of her husband's death. The language of the instrument rather carries the meaning that what the employer gave over and above the amount of the compensation award was intended as a gratuity of the sort which many companies, sometimes under voluntary pension plans, have the policy of giving to dependents of employees who meet a natural death while in the service of the company. The instrument begins with a reference to the relation existing between the employer and employee and proceeds to state the occasion for its being made to be because the deceased "met his death . . . while an employee of and during the course of his employment by Schlitz; and . . . [be-

cause] Schlitz desires to provide toward the care and support of the dependents of the said Harry Kohl. . . ."

There being no showing that the respondent accepted the annuity from Schlitz in complete satisfaction of her cause of action against any and all parties liable in any way for her husband's death and there being no common liability between Schlitz, who is liable only under the Workmen's Compensation Act, and the appellant, who is liable in tort, the instrument by which she accepted the benefit and released Schlitz from all liability cannot be said to have relieved the appellant of liability for his violation, if such there was, of the safe-place statute. We find no error in the trial court's decision that the annuity was virtually a gift from Schlitz. It was therefore proper that the amount Schlitz paid for it was not set off against the recovery allowed against appellant.

This leaves the second question in the case to be considered: Does the evidence sustain the verdict that there was a violation by appellant of the safe-place statute and that that violation was an efficient cause of the death of Harry Kohl?

The safe-place statute, sec. 101.06, Stats. 1941, reads as follows:

"Every employer shall furnish employment which shall be safe for the employees therein and shall furnish a place of employment which shall be safe for employees therein and for frequenters thereof and shall furnish and use safety devices and safeguards, and shall adopt and use methods and processes reasonably adequate to render such employment and places of employment safe, and shall do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employees and frequenters. Every employer *and every owner* of a place of employment or a public building now or hereafter constructed shall so construct, repair or maintain such place of employment or public building, and every architect shall so prepare the plans for the construction of such place of employment or public building, as to render the same safe." (Italics supplied.)

No claim has been made by the respondents that there was any failure on the part of the appellant as to repair or maintenance. The sole claim is that the building was structurally unsafe as a place of employment for the purposes for which it was leased. Appellant contends that the safe-place statute should not be construed to require a building erected prior to the enactment of the statute to meet the standards prescribed in the statute so far as design and structure are concerned.

It cannot be said that the statute does not apply to buildings which were already erected when it was adopted. The statute itself says that it is to apply to every place of employment or public building "now or hereafter constructed." The legislature in the exercise of the general police power has said in this statute that if one is to use his building as a place of employment or as a place which is used by the public as defined in sec. 101.01 (1), Stats. 1941, he must see that the building is safe for such use. Since appellant has leased this building for profit, under circumstances which make it a place of employment, he is under a duty to make the place safe for that employment. The date of the construction of the building cannot alter that duty.

The safe-place statute imposes a duty on the owner beyond that imposed by the common law. When this court considered the effect of that statute in *Olson v. Whitney Bros. Co.* (1915) 160 Wis. 606, 610, 150 N. W. 959, it said,

"The duty imposed . . . by this statute is absolute in the sense that if his . . . place of employment fails to come up to the statutory requirements, in the absence of other defenses he cannot escape liability by showing that he exercised ordinary or even extraordinary care to make it safe. The exercise of care on his part becomes immaterial as a defense *per se*. The only pertinent inquiry is: Was his place of employment safe within the meaning of the statute? If it was not, then the amount of care he may have exercised to make it so becomes immaterial."

The burden imposed by the statute may reasonably require that when an old building constructed for one purpose is to be used for another which imposes greater weight upon certain parts, the owner ought to familiarize himself with the history and method of its construction, including the material used, before turning it over to a portion of the public for profit to himself.

The jury in this case found that the building which collapsed was, at the time when leased to Schlitz, unsafe so that it was not as free from danger to the life, health, safety, or welfare of employees as the nature of the building as a place of employment would reasonably permit. There is credible evidence in the record to sustain that finding. Charles S. Whitney, a consulting engineer who had for many years been engaged in designing structures of various sorts, made an examination of the building at the request of Schlitz after the collapse. Another engineer, Phillip H. Thern, employed by the building department of the industrial commission of the state of Wisconsin, also examined the building after the collapse. With the testimony of these experts before them, the jury was clearly entitled to believe that the building was unsafe. Pertinent parts of their testimony are set forth below.

Whitney: "The weakest members are the columns and they did not have sufficient strength to carry safely the weight of the concrete, of the building itself, without any superimposed load. . . .

"We summarize our conclusions in this way: the building collapsed under a load of cases of beer bottles exceeding the ultimate strength of columns and girders supporting the floors but the faulty design in construction of the building was the primary cause of the failure, with the deteriorated condition of the concrete and steel as a contributing factor. The faulty design resulted in this peculiar proportioning of the concrete which made the slabs stronger than the beams, made the beams stronger than the girder and the girder stronger than the column, proportionately under uniform loading which resulted in a very dangerous condition and no doubt encouraged over-

loading of the building which made it possible for a large area of the building to collapse as it did. . . . The faulty construction resulted in the use of excessive water, dirty, poorly graded gravel. . . ."

. . .

"*Q.* I would like your opinion, Mr. Whitney, as to whether or not this building was safe under the standard engineering practice at the time it was built and in this locality. *A.* Well, I don't believe there was any standard practice in Milwaukee at that time. It was before the existence of the state code. This building was outside of the city limits. There was quite a variety of practice between 1900 and 1908."

"*Q.* Then will you answer this question: Was the building a safe building? *A.* No."

". . . We made tests of the strength of the concrete of the portions still standing. I with a hammer, chipping it. We found it very pliable, weak—consistently weak."

Thern: "Summing up it may be stated with reasonable certainty that the collapse was very probably a result of a combination of several factors, any one of which detracted as a result from the integrity of the building, none of which could be tolerated in present-day practice. The inadequacy in the original structural design, combined with the use of poor, inferior grade of concrete and the careless placing of the reinforcing steel produced a building scarcely capable of withstanding its own weight. Although the floor loads resulting from the storage of cartons of bottles were not excessive for this type of warehouse, they were too much for a building of the quality of the one in question and collapse resulted."

These engineers did also testify that the structural defects might not have been evident before the collapse. There was other evidence tending to show that in the inspection of the building prior to the making of the lease no defects in the building were observed. However, such evidence could go only to the issue of appellant's exercise of ordinary care. It could not relieve appellant of its duty to provide a safe place for employment. The fact that the wall surfaces in an old building do not show signs of deterioration will not of itself excuse further inquiry which might reasonably be made. The evidence of the

material used in this building, brought to light by the collapse, carried with it evidence from which the jury could believe that a reasonably careful consideration before leasing the building of requirements of furnishing a safe place for employment might have made the owner aware of the inappropriateness of the building for the use to which it was put. One of the engineers testified with reference to apparent signs of deterioration:

"Q. Do I understand it is your opinion this existed for some time prior to August 10, 1942? A. I say that there is no question about that. To summarize the condition of the building there were many places where deterioration of the concrete, rusting of the steel must have been apparent before the cases were placed in the building. It appears the building had been in bad condition for years."

The evidence set forth above shows that the jury could justifiably conclude that the building was not so constructed as to render the premises safe for the nature of the employment.

The appellant contends that certain acts of Schlitz proximately caused the collapse, and the death of Kohl. It is alleged that the collapse was due to overloading by Schlitz. The lease authorized a loading up to two hundred pounds per square foot. But the building was not strong enough to bear that much of a load. There was testimony that in one area there was a loading of two hundred nine pounds per square foot. However, the experts agreed that an average load of two hundred pounds per square foot would permit an excess of that amount in a single place as long as the over-all average did not exceed two hundred pounds per square foot if the building had been as strong as the provision in the lease implied. Only part of the third and fourth floors had been loaded at all, and the rest of the building was vacant at the time of the collapse. The average load, even in the area that had been loaded, was well below the limit permitted by the lease.

It is also alleged that an intervening cause of the accident was Schlitz' negligence in sending the men into the building after the occurrence of what was termed a "partial collapse" the day before the accident. The evidence relating to that incident does not warrant a conclusion that it amounted to negligence to allow entry of the building thereafter. The men were sent in the next day to distribute the load in an attempt to avoid further trouble. The condition of the building for which appellant is here held responsible—the condition which the jury determined caused Kohl's death—was the condition of the building at the time the lease was entered into. Even if Schlitz had been negligent in allowing workmen to enter the building after the rumbling noise had been heard and signs of a limited area having settled were noted, that would not relieve the appellant of its liability for the unsafe condition of the building prior thereto and then existing. *Neitzke v. Kraft-Phenix Dairies, Inc.,* (1934) 214 Wis. 441, 253 N. W. 579; *Criswell v. Seaman Body Corp.* (1940) 233 Wis. 606, 290 N. W. 177. There was therefore no error in the trial court's exclusion of further proof of what happened the day before the collapse or in the jury's finding that the condition of the building at the time of the lease was an efficient cause of Kohl's death.

*By the Court.*—Judgment affirmed.