Mustas, Plaintiff and Respondent, v. Inland Construction, Inc., Defendant and Appellant: F. Rosenberg Elevator Company and another, Impleaded Defendants and Respondents.*

*February 4—March 5, 1963.*

* Motion for rehearing denied, without costs, on April 30, 1963.

195

For the appellant there was a brief and oral argument by *Ray T. McCann* of Milwaukee.

For the respondent Harry Mustas there was a brief by *Thomas P. Maras,* attorney, and *Otjen, Philipp & McFadyen* of counsel, all of Milwaukee, and oral argument by *Mr. E. J. Philipp, Jr.,* and *Mr. Maras.*

For the respondent F. Rosenberg Elevator Company there was a brief by *Foley, Sammond & Lardner,* and oral argument by *Gilbert W. Church,* all of Milwaukee.

For the respondent Westinghouse Electric Corporation there was a brief by *Kluwin, Dunphy, Hankin & Hayes* of Milwaukee, and oral argument by *Bernard J. Hankin.*

Brown, C. J. By this appeal the following issues are presented:

(1) Whether Mustas was a trespasser as a matter of law.

(2) Whether the negligence of Mustas was causal as a matter of law.

(3) Whether the place respondent Mustas fell was a place of employment of Westinghouse.

(4) Whether Inland is entitled to indemnity against either or both Westinghouse or Rosenberg.

(5) Whether the damages awarded by the trial court were excessive, notwithstanding the reduction of the jury award.

(1) *Status of Mustas.* The record shows the following circumstances surrounding the fall. On January 3, 1958, Harry Mustas, a truck driver for Lutz Sand & Gravel Company (Lutz), a subcontractor of Inland, was directed by Lutz to deliver a five-yard load of sand to Rosenberg at Mayfair Shopping Center located at the northeast corner of Highway 100 and West North avenue, Wauwatosa, Wisconsin. Lutz told Mustas that the Rosenberg crew was working in the southwest portion of the Marshall Field building. He was given a delivery ticket which he testified showed him where to deliver the sand although the ticket was not produced in court.

The Marshall Field building was 300 feet east and west and about 100 feet north and south. There was an entrance on the north side of the building and one on the west side. Seventy-five feet opposite the entrance on the west side was located the Inland construction office. This construction office was midway along the Marshall Field building and was separated by a roadway area. The east entrance of the construction office was directly opposite the west entrance of the Marshall Field building.

The testimony is in conflict as to what occurred immediately after Mustas entered the shopping-center area from Highway 100 and drove to the Marshall Field building. On direct examination Mustas testified that he parked the truck at the north end of the Marshall Field building and went into the north entrance. He stated he could not remember stopping at the Inland construction office or receiving any instructions from anyone there. On cross-examination he stated he was positive he did not stop at the Inland construction office. He specifically denied talking to anyone. However, he admitted on the cross-examination that his testimony on adverse examination that he could not recall whether

the men at the construction office directed him exactly to where the Rosenberg people were working was true.

Certain portions of a deposition of Harold A. Kimball were introduced into evidence which conflicted with those statements of Mustas. Kimball, who was in the construction office that morning, recalled that Mustas came into the office and spoke to the secretary who called Kimball out of his office. He stated Mustas offered him the delivery ticket but he declined to sign it because the sand was for Rosenberg. He told Mustas that he would have to go out into the Marshall Field building, find their foreman, have him sign it, and have him direct Mustas where to deliver the sand. When asked whether he gave Mustas specific instructions on how he should turn when he entered through the entranceway of the building Kimball replied:

"Yes, I told him to go in and go to the right to the southeast and he would see this here rig that they were drilling this well with. It was up above the floor possibly eight or 10 feet."

According to Kimball, he instructed Mustas to go through the west entrance of the Marshall Field building, the one just opposite that of the construction office. He directed Mustas from the construction-office window facing the Marshall Field building.

In any event, Mustas went through the *north entrance* and observed the floor was rough concrete. Seeing a more brightly lighted area he walked about 150 feet toward that point. When he approached to within about 12 to 15 feet he encountered two men. He inquired whether they were Rosenberg employees. Eugene Borowski, one of these men, stated that they were Westinghouse employees and that the Rosenberg employees were working on the floor below. Mustas was then told by Borowski that he would have to go to the east side of the building and descend

to a lower level. He turned, took two steps, slipped on an icy area and fell. He sustained injuries when his knee struck a concrete block that was frozen in the ice on the floor.

The usual status of Mustas as the employee of a subcontractor to Inland is a frequenter under the safe-place statute. Sec. 101.01 (11), Stats. *Neitzke v. Kraft-Phenix Dairies, Inc.* (1934), 214 Wis. 441, 445, 253 N. W. 579; *Morrison v. Steinfort* (1948), 254 Wis. 89, 35 N. W. (2d) 335; *Williams v. International Oil Co.* (1954), 267 Wis. 227, 229, 64 N. W. (2d) 817; *Frankovis v. Klug & Smith Co.* (1957), 275 Wis. 156, 161, 81 N. W. (2d) 495; *McNally v. Goodenough* (1958), 5 Wis. (2d) 293, 300, 92 N. W. (2d) 890; *Waskow v. Robert L. Reisinger & Co.* (1923), 180 Wis. 537, 193 N. W. 357; *Criswell v. Seaman Body Corp.* (1940), 233 Wis. 606, 290 N. W. 177; *Umnus v. Wisconsin Public Service Corp.* (1952), 260 Wis. 433, 51 N. W. (2d) 42; *Burmek v. Miller Brewing Co.* (1961), 12 Wis. (2d) 405, 107 N. W. (2d) 583.

Mustas would have lost his status as such and would have become a trespasser if he went into an area to which he was neither expressly nor impliedly invited. *Grossenbach v. Devonshire Realty Co.* (1935), 218 Wis. 633, 638, 261 N. W. 742. If Mustas in fact received the instructions from Kimball, Mustas could not have been found to have been a frequenter.

In view of the nature of the testimony of Mustas which conflicts with the statements of Kimball in his deposition, the question is whether there is credible evidence to sustain the jury finding that Mustas was a frequenter. The statements of Kimball are positive evidence that he gave specific instructions to Mustas. Although Mustas testified he did not go into the construction office or speak with anyone there, he also stated that he could not recall whether he went there or spoke with anyone. Under these circumstances his

testimony although positive in form is negative in effect. *Ralph v. Chicago & N. W. R. Co.* (1873), 32 Wis. 177, 181; *Anderson v. Horlick's Malted Milk Co.* (1909), 137 Wis. 569, 574, 119 N. W. 342. The comparative weight of positive and negative testimony depends upon the credibility of the witnesses, and all the evidence is for the jury to consider. *Conrardy v. Sheboygan County* (1956), 273 Wis. 78, 82, 76 N. W. (2d) 560; *Draper v. Baker* (1884), 61 Wis. 450, 456, 21 N. W. 527. The court correctly charged the jury that positive testimony of credible witnesses to the matter was to be given greater weight than the negative testimony of equally credible witnesses to the same matter.

On appeal we accept that version of the evidence that is most favorable to the prevailing party. *Rud v. McNamara* (1960), 10 Wis. (2d) 41, 102 N. W. (2d) 248, sec. 54.85, 7 Callaghan's Pleading & Practice, although contradicted by evidence which may have more weight, sec. 34.54, 5 Callaghan's Pleading & Practice. Therefore, assuming the credibility of Mustas' testimony, a reasonable inference can be drawn from it that he did not go into the construction office or speak with anyone there.

Appellant contends the trial court erroneously concluded that had Mustas not received such instructions the jury could infer he could reasonably proceed into the building for further instructions. It claims that conclusion was contrary to law and to the evidence.

There is credible evidence from which the jury could infer that Mustas was a frequenter if he did not receive any instructions. Mustas did not know the precise location of the Rosenberg crew or where to dump the sand when he entered the premises. Hence, he had the right to make a reasonable inquiry to seek this information. He was directed by Lutz that the crew was in the southwest portion of the Marshall Field building but he did not mention

the floor. The record does not show he was directed to go to the construction office for more-specific instructions. Mustas had never been to the Mayfair construction site before. He testified he did not see the construction office when he arrived there. Under these circumstances the jury could infer that Mustas would not lose his status as a frequenter if he made a reasonable search in the Marshall Field building. There is credible evidence indicating that the route Mustas took while in the Marshall Field building was reasonably incident to his inquiry. He entered the north entrance and walked on the rough concrete floor directly to the men working in a brightly lighted area. The area over which he walked was traveled over by other workers. Therefore, from all the evidence the jury could have found that Mustas was a frequenter.

The case of *McNally v. Goodenough, supra,* is relied upon by appellant as the authority for holding Mustas was a trespasser as a matter of law. In that case the plaintiff was repairing the roof of defendant's store. In order to ask the defendant what to do with certain things he descended the roof and went through the back door, walked through several rooms until he reached the main store, where he saw a clerk. After learning from the clerk that defendant was not present, plaintiff turned around and started to retrace his steps. He became confused and went through a door and into a dark vestibule and fell to the basement. The court held that on his initial trip through the store plaintiff was a frequenter. But when he went through the wrong door on his return he became a trespasser because he did not have any right to be in the vestibule or to use the stairway. Unlike the facts in that case, an inference can be drawn from the evidence here that Mustas' inquiry reasonably took him to the place where he fell and that he had a right to be there.

(2) *Causation.* The jury found Mustas was negligent in exercising reasonable care for his own safety. Such negligence was causal if it was a substantial factor in producing his fall. *Oelke v. Earle* (1956), 271 Wis. 479, 483, 74 N. W. (2d) 336; *Pfeifer v. Standard Gateway Theater* (1952), 262 Wis. 229, 237, 55 N. W. (2d) 29. In the present case a causal connection between Mustas' failure to exercise reasonable care for his own safety to discover the ice and the concrete block is so clear by the undisputed facts that we must hold as a matter of law it was a substantial factor in producing his fall.

The trial court upheld the finding of the jury that Mustas' negligence was not causal on three possible theories:

"The jury could have reasoned that plaintiff was negligent in not seeing the object or ice in his path when he entered the building and walked toward the Westinghouse men but that, regardless, because he fell after talking to them such negligence was not a cause. The jury might have reasoned that even had plaintiff seen the ice and block before the conversation, he might have forgotten the same in the course of his conversation. Thus the fall would have occurred anyway.

"The jury may also have reasoned that the mechanics of the fall were such that it would have occurred regardless of the care exercised by plaintiff. He turned and took a couple steps, then fell. The incident was part of a single act of turning and walking ahead. Under such circumstance the jury might conclude even if plaintiff had been more observant and careful he nonetheless would have fallen."

None of these theories are applicable in view of the law and the nature of the evidence. The first one cannot be sustained because by it Mustas was not under the duty to discover defects in the floor after he had talked to the Westinghouse crew. Mustas was for the first time in this building which was under construction. Under these circumstances his duty to exercise reasonable care to dis-

cover the ice and the concrete block existed both before and after he talked with the crew, and negligence existed in the latter case as well as in the first instance. The second theory cannot be maintained because it is not borne out by the evidence. Mustas testified he never saw the ice or the concrete block before or after the conversation and only saw it after he fell. The last one is also without any foundation in the law or in the evidence. If Mustas had discovered the defect he still was under a duty to exercise reasonable care for his safety, which the jury found he failed to do. The testimony shows that the ice was not so slippery as to make it impossible for a person to traverse it with ordinary care without falling. *Filipiak v. Plombon* (1962), 15 Wis. (2d) 484, 113 N. W. (2d) 365.

The verdict contained only a general question with respect to Inland's and Mustas' negligence. The jury's finding that Mustas was negligent and our holding that this negligence under the existing facts was causal as a matter of law renders the verdict inconsistent because the jury did not apportion any negligence to Mustas in the comparative question. Hence, a new trial is required on the issue of the comparison of negligence as between them. *Veverka v. Metropolitan Casualty Ins. Co.* (1957), 2 Wis. (2d) 8, 85 N. W. (2d) 782; *Statz v. Pohl* (1954), 266 Wis. 23, 62 N. W. (2d) 556, 63 N. W. (2d) 711; *Callan v. Wick* (1955), 269 Wis. 68, 74, 68 N. W. (2d) 438; *Erdmann v. Wolfe* (1960), 9 Wis. (2d) 307, 313, 314, 101 N. W. (2d) 44.

(3) *Finding in favor of Westinghouse.* The evidence is conflicting as to whether Mustas was within the work area of Westinghouse. However, there is substantial credible evidence to sustain the finding that Westinghouse was free from negligence. The icy area in question was to have been taken care of by Fred Pearson, construction superintendent for Inland. Also the Inland labor foreman was

under instructions to sand the icy spots. An employee of Westinghouse, Eugene Borowski, testified that they were not working where Mustas fell. Ewald Gibson, another employee of Westinghouse, stated that the area in which the Westinghouse crew was working was free from any ice. Harold Kimball's testimony was to the effect that the ice was far enough away from the escalators which the Westinghouse crew was installing that there was room for them to work without stepping on the ice.

(4) *Indemnification contract.* We have recognized as being valid agreements allowing indemnification to the owner of a manufacturing plant against a contractor for the former's negligence regardless of its nondelegable duties under the safe-place statute. *Hartford Accident & Indemnity Co. v. Worden-Allen Co.* (1941), 238 Wis. 124, 129, 297 N. W. 436. Generally, contracts between owners and contractors or between general contractors and subcontractors entered into for the purpose of indemnifying the owner or the general contractor against its negligence are considered valid and not contrary to public policy. *Hartford Accident & Indemnity Co. v. Worden-Allen Co., supra,* Anno. 175 A. L. R. 8, 144. For reasons given for the validity of these agreements see Boden, The Problem of Indemnity Under the Safe-Place Statute, 40 Marquette Law Review (1957), 349, 364–366. Also see discussion in *Jacobs v. General Accident Fire & Life Assur. Corp.* (1961), 14 Wis. (2d) 1, 109 N. W. (2d) 462. The question is whether the indemnity provisions of the present subcontracts provide for indemnification for negligence solely on the part of Inland.

The present contracts contain the following provisions:

"8. (c) The subcontractor assumes full responsibility and risk for any and all damage to person or property in the performance of the contract arising out of the assumed work, whether directly or indirectly, to be performed by

said subcontractor, and does hereby agree to and shall hold the owner and contractor, his agents, employees, and representatives, including subcontractor's employees and others, free from, and harmless of and from, any and all claims for injury, including death to all persons including contractor's agents and employees, resulting from, or arising out of, and in connection with, any of the subcontractor's operations. Subcontractor shall defend any such claim asserted or suit brought against the contractor, his agents, employees, representatives, and the owner therefrom, and shall pay any judgment against the owner or contractor resulting from any such suit and all costs of defending any suit, including attorney's fees.

"Subcontractor agrees to forever hold, save and keep harmless and fully indemnify Inland and the owner or owners, or their agents, employees, and representatives, even though not specifically named, its, his, or their officers, employees, and representatives and agents, including the employees of the subcontractor, others, and the general public, of and from all liabilities, damages, claims, recoveries, costs, and expenses because of loss of or damage to property or injury to or deaths of persons in any way arising out of or in connection with the performance of this contract. All rights of subrogation by reason hereof are hereby expressly released and waived.

"Any joint use of facilities permitted by the subcontractor shall be the responsibility of the subcontractor for any damage to person or property, and subcontractor shall provide for his own liability with said joint user."

We, as the overwhelming majority of other states, favor strict construction of indemnity contracts. *Majestic Realty Corp. v. Brant* (1929), 198 Wis. 527, 224 N. W. 743. The contract in the *Hartford* decision provided (p. 127):

" 'In accepting this order you agree to indemnify, reimburse, and save harmless the owner and us of and from all loss and damage to person or property and all claims, suits, or demands arising from damages or injuries to you and your employees, ourselves and our employees, the owner and his employees, other contractors and their employees, and

the general public, due to, arising from, or connected with your operations on this job.' "

In that case we made a distinction between active negligence on the part of the indemnitor and passive negligence on the part of the indemnitee and held the indemnitor liable under the language of this contract. It was not answered whether the indemnitor would be liable under it if the negligence was solely that of the indemnitee. However, we did state:

"It may very well be that if the injuries had arisen solely out of Seaman's default in some respect, and were not in any way attributable to Worden, there would be no liability under the indemnity agreement." *Hartford Accident & Indemnity Co. v. Worden-Allen Co., supra,* page 129.

Later we said:

"A strong argument can be made to the effect that such a case is not covered by the indemnity, but we need not decide this question because it is not here under the facts of this case." *Hartford Accident & Indemnity Co. v. Worden-Allen Co., supra,* page 130.

In accordance with the general rule of strict construction of these contracts, and with previous statements in the *Hartford Case,* the indemnity contracts here are not applicable because they do not expressly provide for indemnification for negligence solely caused by Inland. See *Globig v. Greene & Gust Co.* (1962), 201 Fed. Supp. 945, 952; *Indemnity Ins. Co. v. Koontz-Wagner Electric Co.* (7th Cir. 1956), 233 Fed. (2d) 380, 382. See also 42 C. J. S., Indemnity, p. 579, sec. 12.

Several states have construed language very similar to that used in the present contracts to be very general in nature and not applicable to the negligence of the indemnitee. In *Manhattan R. Co. v. Cornell* (1889), 61 N. Y. (54 Hun),

292, 293, 7 N. Y. Supp. 557 (affirmed (1891), 130 N. Y. 637, 29 N. E. 151), it is stated, ". . . all loss, cost, or damage, . . . from any damages arising from injuries sustained by mechanics, laborers, or other persons, by reason of accidents or otherwise;" and in *Perry v. Payne* (1907), 217 Pa. 252, 254, 66 Atl. 553, ". . . arising from accidents to persons employed in the construction of, or passing near the said work." See also *Pennsylvania Steel Co. v. Washington & Berkeley Bridge Co.* (D. C. W. Va. 1912), 194 Fed. 1011 (reversed on other grounds (C. C. A. 4th Cir. 1914), 215 Fed. 32), and *Gross v. General Investment Co.* (1935), 194 Minn. 23, 259 N. W. 557.

(5) *Award of damages.* The jury awarded plaintiff $24,000 for plaintiff's pain, suffering, and disability. The trial court extended to plaintiff an option to take $18,500 or to have a new trial. Plaintiff accepted the reduced amount and judgment for plaintiff was entered in conformity. Defendant Inland has appealed from the entire judgment.

When the appeal questions the amount of damages as not being supported by the evidence,—as here—and this court has ordered a new trial on other grounds,—as here—it has been our practice to include the issue of damages in the order for new trial. We do so here. We conclude that there must be a new trial on the comparison of the causal negligence of plaintiff and of defendant Inland. The new trial shall also include the issue of plaintiff's damages for pain, suffering, disfigurement, and future disability. *Magin v. Bemis* (1962), 17 Wis. (2d) 192, 200, 116 N. W. (2d) 129; *Anderson v. Saunders* (1962), 16 Wis. (2d) 55, 60, 113 N. W. (2d) 831; *Paulson v. Hardware Mut. Casualty Co.* (1957), 2 Wis. (2d) 94, 101, 85 N. W. (2d) 848.

On appeal Inland successfully contended that plaintiff was guilty of causal negligence as a matter of law. Inland may tax costs against plaintiff for nine pages of Inland's brief devoted to that issue.

Inland was unsuccessful in its contention that plaintiff was a trespasser as a matter of law when injured. Plaintiff may tax costs against Inland for the six and one-half pages of plaintiff's brief upon that issue.

Inland has succeeded in obtaining a new trial on damages and may tax costs against plaintiff for the three and three-fourths pages of Inland's brief devoted to the question of excessive damages.

Inland contended that Westinghouse failed to provide a safe place of employment and is liable for plaintiff's injuries. Inland lost on that issue and Westinghouse may tax costs against Inland for the three pages of Westinghouse's brief opposing that contention.

Inland contended unsuccessfully that both Westinghouse and Rosenberg were liable to Inland as indemnitors under their subcontracts. They may tax costs against Inland for the parts of their briefs upon that issue, as follows: To Westinghouse, one page; to Rosenberg, 17 pages.

*By the Court.*—Judgment reversed, and cause remanded for a new trial on the issue of the comparative causal negligence of plaintiff and of defendant Inland, and on the issue of plaintiff's damages for pain, suffering, disfigurement, and future disability. In other respects the judgment is affirmed. Costs to be taxed in accordance with the opinion.

The following memorandum was filed April 30, 1963:

PER CURIAM (*on motions for rehearing*). Plaintiff Mustas and defendant Inland, in support of their respective motions for rehearing, reargue propositions previously considered and decided. We deem the respective motions without merit.

We deem it advisable, however, to make this observation lest the scope of the new trial ordered be not fully understood. We intend that the answers to certain questions in the special verdict be set aside and that the new trial ex-

tend to the issues submitted by those questions. The questions are: No. 2, negligence of Inland; No. 3, whether such negligence, if any, was causal; No. 6, negligence of plaintiff; No. 7, whether such negligence, if any, was causal; No. 8, comparison of causal negligence; and No. 9 (c), compensation for pain, suffering, disfigurement, and permanent disability.

The motions for rehearing are denied, without costs.