DYKSTRA, and wife, Plaintiffs-Respondents, v. ARTHUR G. MCKEE & COMPANY, and another, Defendants and Third-Party Plaintiffs-Appellants: J. F. AHERN COMPANY, Third-Party Defendant-Appellant.†

Court of Appeals

*No. 77–513. Submitted on briefs December 20, 1978.—Decided September 18, 1979.*
(Also reported in 284 N.W.2d 692.)

---

† Petition to review granted.

20

For the defendants and third-party plaintiffs-appellants the cause was submitted on the briefs of *Arnold, Murray, O'Neill & Schimmel*, of Milwaukee.

For the third-party defendant-appellant the cause was submitted on the briefs of *Hayes & Hayes* of Milwaukee.

For the plaintiffs-respondents the cause was submitted on the brief of *David A. Saichek of Gaines & Saichek, S.C.* of Milwaukee.

Before Gartzke, P.J., Bablitch, J. and Dykman, J.

BABLITCH, J.   This is an action brought under the safe-place statute, sec. 101.11(1), Stats., to recover damages for personal injuries suffered by respondent Ralph C. Dykstra.  Dykstra was injured when he slipped and fell in a one-story building being constructed on a site owned by appellant Jetco Properties, Inc. (Jetco). At that time, Dykstra was employed by the appellant J.F. Ahern Co. (Ahern) as a steamfitter.  Ahern was a subcontractor hired to do certain plumbing and refrigeration work on the building by the general contractor, appellant Arthur G. McKee & Co. (McKee).

Dykstra and his wife brought suit against McKee and Jetco alleging in their complaint that the general contractor and owner, respectively, had negligently failed to keep a concrete floor in the building reasonably free from water and sand, upon which Dykstra had allegedly slipped, in violation of their duty under the safe place statute to "furnish employment which shall be safe." McKee and Jetco joined Dykstra's employer Ahern as a third-party defendant, seeking indemnification for damages under a clause of the subcontract. The clause provided that Ahern would indemnify McKee and its customers (e.g., Jetco) from damages arising in connection with the performance of the subcontract unless Ahern could prove that (1) the damage was caused "solely" by McKee's "active negligence" and (2) that Ahern was "at all times diligently trying to minimize the possibility of such . . . damage . . . and . . . the consequences thereof."

The negligence issue was tried to a jury, which was asked in a special verdict to consider only the negligence of Dykstra and McKee.[1] The jury found McKee 80 percent negligent and Dykstra 20 percent negligent, and awarded total damages to Dykstra of $164,849.44 and to his wife in the amount of $3,500. The trial court denied motions for a directed verdict, upon which it reserved ruling until after verdict; it also denied post-trial motions to change the jury's apportionment of negligence and for a new trial.

The indemnification issue was tried to the court subsequent to the jury's verdict. The trial court construed

[1] No party alleged negligence on the part of Ahern. The record is silent as to why Jetco's negligence, alleged in Dykstra's complaint, was not separately considered. Jetco and McKee were represented by the same counsel. It seems apparent that all parties assumed that Jetco's liability was coextensive with McKee's liability as a matter of law.

the subcontract to require indemnification by Ahern to McKee.

All three appellants appeal from the portion of the judgment pertaining to liability for damages; Ahern also appeals from the portion of the judgment ordering it to indemnify McKee and Jetco. The issues are:

1. whether the evidence is sufficient to support the jury's verdict;
2. If so, whether the indemnification provision of the contract is void as against public policy; and
3. If not, whether the trial court correctly construed the indemnification clause in the subcontract.

## SUFFICIENCY OF EVIDENCE

The facts are not in substantial dispute. The accident occurred on August 16, 1972. Dykstra was injured when he slipped and fell in a corridor in the partially completed building. Dykstra had been in this corridor "a couple of different times" prior to the accident. The corridor was described as a "major thoroughfare" in frequent use by the six or seven different trades (subcontractors) at the site. It was about five feet wide and twenty-five to thirty feet in length. Its floor was made of smooth, highly finished concrete.

The exterior walls of the building were erected and some of the interior walls were in place, but the one-story building had not been completely roofed. A "roof deck" had been installed over part of the building, including the area over the vicinity where Dykstra was injured. Several holes had been cut into this deck to accommodate pipes. Gaps of between one and one and one-half inches existed between the roof deck and the circumferences of the pipes. Since the roofing contractor had not yet installed flashing or sealant material around the gaps, the roof deck was not water tight in these several areas.

Dykstra had been working on the site for about two weeks prior to his accident. He testified that the gaps around the pipes in the roof deck had been in substantially the same condition for those two weeks. It had been raining every other day or so for several days before the accident, and had been hot and humid. The floor of the corridor was "wet" or "damp" and sandy on the day in question. The source of the sand is not entirely clear, but Dykstra testified that he had seen sand fall from other workers' shovels and from wheelbarrows moving through the corridor on previous occasions. He described the floor as generally dirty with scattered candy wrappers. There is evidence that the concrete floor tended to become moist with condensation on hot, humid days. On the day of the accident, it was hot and humid.

On the morning of the accident, Dykstra walked through the corridor at about 8:00 a.m. and observed the condition of the floor as previously noted. At about 10:00 a.m. on that date, he was returning through the corridor to obtain some tools when he slipped and fell to the floor, injuring his right knee. Several witnesses testified that his clothing was wet and sandy after the fall.

As the result of the injury, Dykstra had two corrective surgeries culminating with the removal of his kneecap. In April, 1974 the condition had worsened to such an extent that he had to quit his job, and had been unemployed since that time.

At trial Dykstra's father-in-law testified as an expert in the field of construction safety. He testified that it is the duty of a general contractor, such as McKee, to take preventive measures to insure that the roof of a partially completed building does not leak, and that pass-through areas such as the corridor are dry and safe for the use of the workers. One method of preventing or minimizing leaks, he said, was to construct temporary

"dams" over any openings in a roof with two-by-fours and tarpaper or some other temporary sealer. He testified that floors could be kept dry and less slippery by spreading sawdust over them. He stated that it was necessary to keep pass-through areas dry regardless of whether the source of moisture was through leaks in the roof or condensation.

There is no evidence that McKee employed the suggested measures, or any measure, to prevent the floor in question from becoming wet and slippery. While McKee performed general "housecleaning" operations on Fridays of each week, no cleanup was performed on a regular daily basis.

The appellants contend that this evidence is insufficient to establish a violation of the safe place statute. We disagree with this contention.

Section 101.11(1), Stats., requires employers to furnish a place of employment safe for employees and "frequenters," to "use methods . . . reasonably adequate to render such . . . places of employment safe," and to:

[d]o every other thing reasonably necessary to protect the life, health, safety and welfare of such employes and frequenters. Every employer and every owner of a place of employment or a public building now or hereafter constructed shall so construct, repair or maintain such place of employment or public building as to render the same safe.

Sec. 101.11(2)(a) prohibits employers from allowing employees to be in a place of employment which is not safe, or from failing to adopt safety measures:

[r]easonably adequate to render such . . . place of employment safe [for employees and frequenters], and no such employer shall fail or neglect to do every other thing reasonably necessary to protect the life, health,

safety or welfare of such employes and frequenters; and no employer or owner, or other person shall hereafter construct or occupy or maintain any place of employment, or public building, that is not safe, nor prepare plans which shall fail to provide for making the same safe.

Though not an employee of McKee, Dykstra was a "frequenter" to whom McKee owed the statutory duty of care, since it maintained supervisory control over the premises.[2] The duty imposed by the statute is a higher duty than that of ordinary care imposed at common law, though it does not make the employer into an "insurer."[3] The mere fact that an accident happened does not prove that the place is not safe within the meaning of the statute,[4] but the employer has a duty to make the place "as safe as the nature of the place will reasonably permit."[5] Whether the place is reasonably safe within the meaning of the statute is dependent upon the facts and circumstances of the particular case.[6] In all but exceptional cases, the question is for the jury.[7]

[2] *Barth v. Downey Co., Inc.*, 71 Wis.2d 775, 778–79, 239 N.W.2d 92 (1976); *Young v. Anaconda American Brass Co.*, 43 Wis.2d 36, 45, 168 N.W.2d 112 (1969); *Neitzke v. Kraft-Phenix Dairies, Inc.*, 214 Wis. 441, 253 N.W. 579 (1934).

[3] *Zernia v. Capitol Court Corp.*, 21 Wis.2d 164, 168, 124 N.W.2d 86, 88 (1963).

[4] *DeMarco v. Braund*, 30 Wis.2d 675, 681, 142 N.W.2d 165 (1966).

[5] *Presti v. O'Donahue*, 25 Wis.2d 594, 599, 131 N.W.2d 273, 275 (1964); *Zernia v. Capitol Court Corp.*, 21 Wis.2d 164, 170d, 124 N.W.2d 86 (1963).

[6] *Gross v. Denow*, 61 Wis.2d 40, 47, 212 N.W.2d 2 (1973); *DeMarco v. Braund*, 30 Wis.2d 675, 677, 142 N.W.2d 165 (1966); *Powless v. Milwaukee County*, 6 Wis.2d 78, 81, 94 N.W.2d 187 (1959).

[7] *DeMarco v. Braund*, 30 Wis.2d 675, 677, 142 N.W.2d 165 (1966); *Becker v. Barnes*, 50 Wis.2d 343, 346, 184 N.W.2d 97 (1971).

The standard of review on appeal was set forth in *Shoemaker v. Marc's Big Boy*, 51 Wis.2d 611, 615, 187 N.W.2d 815, 817–818 (1971), as follows:

The jury's findings must be upheld if there is any credible evidence which under a reasonable view admits to an inference which supports the verdict. *Becker v. Barnes* (1971), 50 Wis.2d 343, 184 N.W.2d 97. This is especially true where, as here, the verdict has the approval of the trial court. *Capello v. Janeczko* (1970), 47 Wis.2d 76, 176 N.W.2d 395. The evidence must be viewed in a light most favorable to the jury's verdict. *St. Paul Fire & Marine Ins. Co. v. Burchard* (1964), 25 Wis.2d 288, 130 N.W.2d 866. [*See also DeMarco v. Braund,* 30 Wis.2d 675, 677, 142 N.W.2d 165 (1966).]

In our view, the evidence amply supports the finding that the corridor in which Dykstra was injured could have been rendered safer by the use of reasonable means. It requires no special exercise in the faculty of common sense to recognize that a smooth and highly finished concrete floor is slippery when wet and covered with sand, and will therefore present a hazard for persons walking on it. Whether the moisture on the floor was caused by rain or by condensation we deem to be immaterial. While either cause was attributable to weather conditions beyond the control of anyone, the condition of the floor resulting therefrom could have been prevented or controlled by plugging the leaks in the roof, spreading absorbent material such as sawdust or a tarpaulin on the floor, or by regular mopping. The spectre raised by appellant of "legions" of employees armed with "brooms, mops, squeegees and sponges" necessary to accomplish this task throughout the entire construction site is not persuasive. The corridor floor in question, which is the only floor in the building referred to in the record, occupied a maximum space of five by thirty feet. It was used frequently by a large number of workers. No large

cleaning detail would have been required to keep the floor reasonably dry and safe for those workers.

Appellants contend that the evidence fails to show that McKee had either actual or constructive notice of the hazardous condition. Proof of such notice is a prerequisite to recovery under the statute.[8] Where the unsafe condition is caused by climatic conditions beyond the control of the owner or employer, or by "temporary and transitory" conditions, "a longer length of time has been allowed to discover and correct the unsafe condition . . . than in . . . cases where the unsafe condition is caused or occasioned by the method of doing business and therefore under more control of the occupant of the premises."[9]

The evidence is undisputed that it had been raining fairly regularly for several days before the accident; that there were holes in the roof over the area in which Dykstra was injured; that it had been hot and humid for several days, perhaps causing additional moisture on the floor through condensation; that the corridor was a "major thoroughfare" used by workers from a variety of trades, some carrying shovels or pushing wheelbarrows through the area; that sand was "usually present" on the floor. The jury could reasonably have concluded that this was no sudden or transitory condition, but one which had persisted for at least two weeks prior to the accident.

Moreover, it is undisputed that McKee's own workers were on the site regularly and that a McKee supervisor

[8] *Shoemaker v. Marc's Big Boy*, 51 Wis.2d 611, 615, 187 N.W.2d 815 (1971); *Merriman v. Cash-Way, Inc.*, 35 Wis.2d 112, 115, 150 N.W.2d 472 (1966); *Presti v. O'Donahue*, 25 Wis.2d 594, 599, 131 N.W.2d 273 (1964).

[9] *Steinhorst v. H.C. Prange Co.*, 48 Wis.2d 679, 683, 180 N.W.2d 525, 527 (1970); *Krause v. Veterans of Foreign Wars Post No. 6498*, 9 Wis.2d 547, 555, 101 N.W.2d 645 (1960).

actively directed the construction and the work of the subcontractors. It is also undisputed that McKee was responsible for the sweeping and cleaning activities at the site. This is not a situation of an absentee or remotely involved general contractor without daily contact and control. *Cf. Barth v. Downey Co., Inc.,* 71 Wis.2d 775, 239 N.W.2d 92 (1976). Under such circumstances, the law presumes knowledge of the hazardous conditions. "We say a person has constructive notice of something when for the promotion of sound policy or purpose he is to be treated as if he had actual notice, whether or not he had it in fact." *Uhrman v. Cutler-Hammer, Inc.,* 2 Wis.2d 71, 75, 85 N.W.2d 772, 774 (1957). Constructive notice is imposed in circumstances where:

"[C]ertain things existing in the relation or the conduct of the parties, or in the case between them, beget a presumption so strong of actual knowledge that the law holds the knowledge to exist because it is highly improbable it should not; and . . . [where] the policy and the safety of the public forbid a person to deny knowledge while he is so dealing as to keep himself ignorant, or so that he may keep himself ignorant." *Merriman v. Cash-Way, Inc.,* 35 Wis.2d 112, 116, 150 N.W.2d 472, 475 (1967) [citing 39 Am. Jur., Notice and Notices, sec. 7 at 236 (1942)].

The circumstances of this case compel the conclusion that McKee had constructive, if not actual, notice of the condition of the floor, and that it should have known of the hazard that condition presented to persons walking on it.

Appellants McKee and Jetco contend that Dykstra's negligence exceeded McKee's negligence as a matter of law, and that the trial court erred in denying the motion for directed verdict at the conclusion of the trial. We believe that this contention has no merit for the reasons previously set forth. Apportionment of negligence is

"within the special province of the jury." *Gross v. Denow*, 61 Wis.2d 40, 48, 212 N.W.2d 2, 7 (1973).

## INDEMNIFICATION

The indemnification clause in the subcontract provides:

You [Ahern] *shall assume liability for,* be responsible for, indemnify (and at our request, defend), and save harmless ourselves [McKee], and anyone (including our customers) to whom we may be liable by contract or otherwise, against any loss, *damage,* or expense *arising from any* actual or claimed death or actual or claimed *injury to any person,* or actual or claimed damage to property, whether owned by you, ourselves or third parties, including loss of use, *which* actually or allegedly *results from, or* actually or allegedly *arises in connection with, the performance of this subcontract,* (including any such injury, death, or damage caused in part by our negligence) *unless you can prove by clear and convincing evidence that such* death, *injury,* damage, or loss of use *was caused solely by our active negligence and that you were at all times diligently trying to minimize the possibility of such* death, *damages,* or loss or use *and,* if such occurred, *the consequences thereof.* (Emphasis supplied.)

The trial court construed this language to require Ahern to indemnify McKee if Dykstra's injuries arose in connection with the performance of the subcontract and unless the evidence established that the injuries were caused solely by McKee's active, rather than merely passive, negligence *and* that Ahern made diligent efforts to "minimize the possibility of" the injuries. It found:

1. that the injuries arose out of the subcontract;
2. that they were caused solely by the negligence of McKee in failing to seal the holes in the roof, and that such negligence was "active" as the "equivalent of a positive act";

3. that the evidence showed no effort on the part of Ahern to minimize or eliminate the condition that caused the accident.

On appeal Ahern contends that the contract, as so construed, is void as against public policy because it delegates to Ahern the nondelegable duties imposed on McKee under the safe-place statute. This contention was not directly addressed by the trial court.

It is well established that duties under the safe-place statute may not be delegated. *Novak v. Delevan,* 31 Wis. 2d 200, 207, 143 N.W.2d 6 (1966); *Criswell v. Seaman Body Corp.,* 233 Wis. 606, 618, 290 N.W. 177 (1940). However, we cannot agree with Ahern's contention that this contract has that effect. The contract does not delegate or transfer the employer's statutory duties to Ahern, nor does it relieve McKee of those duties. While it imposes a responsibility on the subcontractor to make diligent efforts to "minimize the possibility of" injuries to third parties, among other things, the contractual responsibility is not the equivalent of providing a safe work place under the statute.

Under the scheme of this contract, the subcontractor is placed on the "front line" with respect to conditions involving the performance of the subcontract which are likely to cause injuries or give claim to other types of damages. Its liability under the indemnification provisions is contingent upon its own failure to take positive steps to remedy or avoid those conditions. We cannot say that this contractual scheme is contrary to public policy. It places a heavy burden of affirmative responsibility on the party most likely to have knowledge of a dangerous or otherwise defective condition.

In this case, Ahern had at least as much reason to know of the danger which caused Dykstra's injuries as

McKee did. Its actual knowledge is apparent from the testimony of its employee, Dykstra's foreman, who said that the corridor was "usually wet." It is undisputed that Ahern did nothing to warn its employees to avoid using the corridor or to exercise special care when doing so. It did not complain to or demand curative action from McKee, despite the fact that a McKee supervisor was regularly present at the site. Nor did it take any affirmative action, such as mopping the floor, to prevent the possibility of injury. It ignored the dangers posed to its workmen and other persons at its peril under the indemnification clause. The fact that Ahern did not have the legal right to "control" the corridor did not leave it helpless to take some step to prevent or minimize its dangerous condition.

Ahern concedes that the general rule in Wisconsin is that indemnification contracts are valid and not against public policy. *See, Barrons v. J. H. Findorff & Sons, Inc.*, 89 Wis.2d 444, 278 N.W.2d 827 (1979). This is so even where the indemnitor is free from negligence, and the indemnitee is negligent. "Generally, contracts providing for indemnification in the case of the indemnitee's negligence are considered valid and not contrary to public policy." *Herchelroth v. Mahar*, 36 Wis.2d 140, 145, 153 N.W.2d 6, 8 (1967); *Mustas v. Inland Construction, Inc.*, 19 Wis.2d 194, 205, 120 N.W.2d 95, 101 (1963). *Hartford Accident & Indemnity Co. v. Worden-Allen Co.*, 238 Wis. 124, 297 N.W. 436 (1941), *Baker v. McDel Corp.*, 53 Wis.2d 71, 191 N.W.2d 846 (1971). In *Spivey v. Great Atlantic & Pacific Tea Co.*, 79 Wis.2d 58, 63, 255 N.W.2d 469, 472 (1977), the supreme court stated the general rule as follows:

"A contract agreeing to indemnify a party against the consequences of his own negligence is not against public policy. . . . But such a construction will not be put upon

a contract unless it is very clearly intended." Quoting Prosser, *Torts,* sec. 51 at 310, n. 90, (4th ed. 1978).

In *Herchelroth, supra,* the supreme court held that the strict construction of the contract there at issue required the indemnitor, who was the lessor of a truck, to indemnify for personal injury damages after a collision between the truck and an automobile, despite the fact that the indemnitee was solely negligent in causing the accident. That case involved an action for common law negligence, as opposed to an action for breach of a statutory duty such as this case involves. Indemnification contracts have been found valid in the context of actions brought under the safe place statute, *Hartford, supra; Mustas, supra; Spivey, supra;*[10] and *Baker, supra.* However, no Wisconsin case has enforced such a contract in a safe-place action where the indemnitee's active negligence is the sole cause of the injuries.

In *Hartford, supra,* the court found that a subcontractor whose employee was injured during construction of a building was liable under an indemnification contract to the owner of the building whose negligence had been merely passive, and where the subcontractor's own negligence contributed to the injuries. In *Mustas v. Inland Construction, Inc.,* 19 Wis.2d 194, 205, 120 N.W.2d 95, 101 (1963) and *Spivey, supra,* the court found that the language of the indemnification contracts did not "expressly provide for indemnification for negligence solely caused" by the indemnitees, and that they were therefore not entitled to recover against the indemnitors. In *Baker, supra,* the court found that a lessee-indemnitor was required by the terms of a lease agreement to in-

---

[10] Though the court's opinion in *Spivey,* supra, does not specify that the action was brought under the safe place act, that fact is apparent from the complaint reproduced in the parties' briefs on the appeal of that case.

demnify a lessor in circumstances where the negligence of both parties had contributed to the plaintiff's injuries.

The question presented by this appeal is consequently whether a non-negligent indemnitor[11] is liable to an indemnitee whose breach of a duty imposed by the safe-place statute is solely responsible for the damages, where the indemnitor has made no effort to mitigate that breach, if the indemnification contract expressly so provides.

Ahern contends that certain language in *Hartford, supra,* amounts to a "suggestion" by the supreme court that indemnification agreements which shift liability from a solely negligent owner or employer to an entirely blameless indemnitor, and which place an affirmative duty on the latter to avoid the consequences of the negligence, would be found void as against public policy. In that case, the indemnification agreement provided:

In accepting this order you agree to indemnify . . . the owner and us of and from all loss . . . arising from damages or injuries . . . due to, arising from, or connected with *your* operations on this job. 238 Wis. at 127, 297 N.W. at 438. (Emphasis supplied.)

In construing this language, the court observed:

It may very well be that if the injuries had arisen solely out of [the owner's] default in some respect, and were not in any way attributable to [the subcontractor-indemnitor] there would be no liability *under the indemnity agreement.* 238 Wis. at 129, 297 N.W. at 439. (Emphasis supplied.)

---

[11] In its memorandum decision, the trial court stated: "Ahern was not negligent." The question of Ahern's negligence was not submitted to the jury. No additional evidence was presented to the court for its consideration in resolving the indemnity issue. For purposes of this opinion, we accept the trial court's statement as a finding of fact which need not be reviewed on this appeal in light of our holding.

As we have heretofore suggested, it may be that *the contract* does not cover cases in which the sole proximate case of the injuries resulted in [the owner's] liability were defaults on the part of [the owner] wholly uncontributed to by [the subcontractor]. A strong argument can be made to the effect that such a case is not covered by the indemnity, but we need not decide this question because it is not here under the facts of this case. 238 Wis. at 130, 297 N.W. 439. (Emphasis supplied.)

The above-quoted statements are dicta which do not support appellant's contention. They involve the hypothetical application of the specific contract there being construed to facts not before the court. That contract did not expressly indemnify the indemnitee from the consequences of its own negligence.

Ahern also cites the following language of the *Hartford* court:

It is also suggested that it would be contrary to public policy to extend the clause of this type to include indemnity for violation of the safe-place statute because it would tend to discourage the discharge of Seaman's duties in that respect. *It may well be that [the owner] could not contract with members of the general public and employees of [the subcontractor-indemnitor] that it would not be liable for its own failure to maintain a safe place for frequenters and employees.* That is not what it did, however. It simply . . . exacted an indemnity contract from defendant, . . . to cover cases where defendant's default contributed actively to [the owner's] liability. 238 Wis. at 131–32, 297 N.W. at 440. (Emphasis supplied.)

We do not construe the court's dictum that an owner or employer could not contract "with members of the generally public and employees" against liability for its negligence to mean that it could not contract with anyone to indemnify its negligent acts. It would clearly be contrary to public policy to leave employees of frequenters

without recourse for injuries caused by a violation of the safe-place statute. This is not the effect of this contract. Its effect is to shift liability, under certain circumstances, not to extinguish it.

In *Mustas, supra,* the court considered the effect of the *Hartford* holding and dicta in the context of indemnity provisions broadly making a subcontractor liable for injuries "arising out of or in connection with the performance of this contract." 19 Wis.2d at 205, 120 N.W.2d at 101. It observed:

> We have recognized as being valid agreements allowing indemnification to the owner of a manufacturing plant against a contractor for the former's negligence regardless of its nondelegable duties under the safe-place statute. [citing *Hartford, supra.*] Generally, contracts between owners and contractors or between general contractors and subcontractors entered into for the purpose of indemnifying the owner or the general contractor against its negligence are considered valid and not contrary to public policy. . . . The question is whether the indemnity provisions of the present subcontracts provide for indemnification for negligence solely on the part of [the contractor].

The court held that the contracts in question must be strictly construed, and that as so construed they did not create a liability in the subcontractor *"because* they do not *expressly* provide for indemnification for negligence solely caused by" the general contractor. *Mustas,* 19 Wis.2d at 207, 120 N.W.2d at 102 (emphasis supplied). In the more recent case of *Spivey, supra,* the court reached a similar result, for similar reasons. Observing that the court had "consistently upheld the validity of indemnity contracts," 79 Wis.2d at 63, 255 N.W.2d at 472, quoting *Bialas v. Portage County,* 70 Wis.2d 910, 236 N.W.2d 18 (1975), the court held:

> In cases such as the instant one, where the indemnitor . . . is itself free of negligence, the obligation to in-

demnity [sic] an indemnitee for its own negligence must be clearly and unequivocally expressed in the agreement. General language will not suffice. 79 Wis.2d at 63, 255 N.W.2d at 472.

The supreme court's approach in both *Mustas, supra,* and *Spivey, supra,* evinces its assumption that the rules generally applicable to the construction and enforcement of indemnification contracts are applicable in safe-place actions as well as to actions in common law negligence. *See also Barrons v. J. H. Findorf & Sons, Inc.,* 89 Wis.2d 444, 278 N.W.2d 827 (1979). We see no reason to distinguish between the two types of actions in applying those rules in this case. Whether the duty breached by the indemnitee is statutory or one arising out of common law is irrelevant.[12] The question in either case is whether the contract shows an unequivocal intent to indemnify the indemnitee for its sole negligence. *Spivey, supra.*[13]

---

[12] A similar claim was rejected in *Baker v. McDel Corp.,* 53 Wis.2d 71, 79, 191 N.W.2d 846, 851 (1971). The court stated:

Finally, respondent contends that the indemnity agreement refers only to common-law negligence, rather than the higher standard of care required by Wisconsin's safe-place statute. We do not agree. The safe-place statute does not create a new cause of action . . . but merely establishes an increased standard of care, violation of which is negligence . . . . Violation of the safe-place statute would, therefore, be included under this indemnity agreement. [Citations omitted.]

[13] Ahern draws our attention to sec. 895.49, Stats., which was created by the legislature subsequent to the trial court's decision in this action. Sec. 895.47, ch. 441, Laws of 1977. It provides in part:

(1) Any provision to limit or eliminate tort liability as a part of . . . any contract . . . relating to the construction . . . of a building . . . is against public policy and void.

(3) This section shall not apply to any provision of any contract, covenant or agreement entered into prior to July 1, 1978.

The statute does not apply to this contract, which was executed prior to July 1, 1978. We cannot agree with Ahern's contention

Such an intention is unequivocally expressed in the present contract. It provides that Ahern must indemnify McKee for injuries "caused solely by our active negligence" unless Ahern can prove that it was "at all times diligently trying to minimize the possibility of such . . . damage . . . and the consequences thereof." This places a heavy burden on the subcontractor, but it is a burden for which it bargained.

The language of a contract must be understood to mean what it clearly expresses. A court may not depart from the plain meaning of a contract where it is free from ambiguity. [citation omitted.] In construing the terms of a contract, where the terms are plain and unambiguous, it is the duty of the court to construe it as it stands, even though the parties may have placed a different construction on it. [citation omitted.] It seems to us that when parties to a contract adopt a provision which does not contravene a principle of public policy, and which contains no element of ambiguity, the court has no right, by a process of interpretation, to relieve one of them from any disadvantageous terms which he has actually made. *Algrem v. Nowlan,* 37 Wis.2d 70, 79, 154 N.W.2d 217, 221 (1767), quoting *Cernohorsky v. Northern Liquid Gas Co.,* 268 Wis. 586, 592–93, 68 N.W.2d 429, 433 (1955).

Ahern further contends that under the applicable rules of strict construction the contract must be seen as contemplating indemnification only as injuries directly attributable to the negligence of Ahern occurring in areas of the construction site over which Ahern and McKee have joint control. Ahern contends that the duty to indemnify for injuries which "arise in connection with

that it "codifies" prior case law respecting indemnification contracts, for the reasons stated in this opinion. Whether it is intended to void indemnification contracts which shift liability, or exculpatory contracts which limit or preclude liability, is a question not before us.

the performance of this subcontract" is modified by the language "(including any such injury . . . caused *in part* by our negligence)." (Emphasis as in appellant's brief.) It reasons that the italicized language limits its duty to indemnify to situations where the parties are jointly negligent.

To so construe the contract would render meaningless the remaining language of the contract which limits Ahern's duty to indemnify for injuries caused "solely" by McKee's "active negligence" to situations where Ahern has failed to act diligently to minimize the consequences of that negligence. Only by construing the words "in part" to mean "in any part" does the contract, as an integral whole, make sense. The rule of strict construction cannot be employed to avoid the clear intent of the parties.[14]

The kinds of "diligent acts" required under the contract if liability is to be avoided would necessarily vary depending on the nature and degree of the subcontractor's control over, or notice of, the contractor's negligent acts or omissions. Here, though Ahern had no absolute control over the corridor, it had both notice of its dangerous condition and the ability to take some action to minimize or avoid the damages. Its failure to take action rendered it liable under the indemnification clause.

In light of our conclusion, it is unnecessary to consider the issue raised by McKee and Jetco as to whether McKee's negligence in failing to cover the holes in the roof was "active" or "passive" within the meaning of the contract.

*By the Court.*—Judgment affirmed.

[14] *Baker v. McDel Corp.*, 53 Wis.2d 71, 78, 191 N.W.2d 846 (1971); *Johnson v. Prange-Geussenhainer Co.*, 240 Wis. 363, 2 N.W.2d 723 (1942).