BADGER PHARMACAL, INC., d/b/a
Wisconsin Pharmacal Company,
Inc., Plaintiff–Appellant,

v.

COLGATE–PALMOLIVE COMPANY
and SoftSoap Enterprises, Inc.,
Defendants–Appellees.

No. 92–2810.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 14, 1993.

Decided Aug. 6, 1993.

John R. Stoffer, Stephen T. Jacobs (argued), David J. Sisson, Reinhart, Boerner, Vandeuren, Norris & Rieselbach, Milwaukee, WI, for plaintiff-appellant.

Reuben W. Peterson, Jr., James M. Fredericks, Borgelt, Powell, Peterson & Frauen, Milwaukee, WI, Charles A. Gilman (argued), Laura Mezey, Cahill, Gordon & Reindel, New York City, for defendants-appellees.

Before COFFEY and KANNE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

KANNE, Circuit Judge.

Wisconsin Pharmacal Company (WPC) sued Colgate–Palmolive Company (Colgate) and its wholly owned subsidiary, SoftSoap Enterprises (SoftSoap), for breach of contract, claiming the defendants had failed to use their best efforts under an exclusive marketing agreement between the parties. Two other claims solely against Colgate alleged negligent and strict responsibility misrepresentation,[1] also involving the marketing agreement.

---

1. Wisconsin courts generally do not distinguish between what they call "strict responsibility misrepresentation" and strict liability misrepresentation. See, e.g., Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Boeck, 127 Wis.2d 127, 377 N.W.2d 605, 611 (1985); Stevenson v. Barwineck, 8 Wis.2d 557, 99 N.W.2d 690, 693 (1959). However, one court has indicated these concepts, while closely related, are not identical. In Reda v. Sincaban, the Wisconsin Court of Appeals stated:

Unlike strict responsibility, strict liability does not "impose absolute liability," but is more like negligence per se....
An action for strict responsibility for misrepresentation is more akin to an absolute liability case than a strict liability case. As in an absolute liability case, contributory negligence is not a defense to a strict responsibility claim. 145 Wis.2d 266, 426 N.W.2d 100, 103 (Ct.App. 1988) (citations omitted), rev. denied, 146 Wis.2d 875, 430 N.W.2d 918 (1988).

After the district court dismissed the misrepresentation counts against Colgate, WPC filed an amended complaint adding a second breach of contract claim, this one charging that both defendants had improperly terminated the agreement. Colgate and SoftSoap moved for summary judgment on both counts; WPC moved for summary judgment on the termination issue. The district court granted the defendants' motion. On consideration of the merits, we agree that the plaintiff has failed to state viable claims for negligent and strict responsibility misrepresentation against Colgate, but find that Colgate and SoftSoap did not fulfill their obligations to WPC when they defaulted in their performance of the agreement.

## I.

WPC, a Wisconsin corporation, is the inventor of "Disposer Care," a cleaning powder for kitchen sink garbage disposers. In 1986, WPC entered into an exclusive marketing agreement with SGM Group, Inc. (SGM), under which SGM would market and sell Disposer Care. According to the agreement drafted by WPC, SGM agreed to purchase all of its requirements of Disposer Care from WPC, and to "utilize its very best efforts to advertise and promote" the product. WPC earned money under the agreement both from sales to SGM and from patent royalties. Royalties were based on net sales and paid to WPC annually. The payments were to continue until SGM had paid "an aggregate of $5 million," after which SGM's obligation to pay royalties, but not its obligation to continue marketing and distributing WPC's product, would end (unless SGM opted to purchase all right, title, and interest in Disposer Care under a purchase option provision in the marketing agreement).

One provision of the agreement guaranteed payment of minimum royalties to WPC. Section 2(b)(ii) provides, in relevant part:

SGM shall pay to WPC, and Twin Oak Products, Inc. guarantees such payment, of $1.5 million in royalties regardless of whether it continues to sell Product or utilize the Trademark unless SGM is pro-

hibited from selling the Product. The unpaid portion of such guaranteed minimum royalties shall become immediately due and payable in the event of a default by SGM hereunder or termination of this Agreement.[2]

By its terms, the marketing agreement would end upon the earlier of: (1) the patent's expiration, (2) consummation of the aforementioned purchase option, whereby SGM would purchase Disposer Care from WPC for $5 million, less the amount of royalties previously paid, or (3) termination of the agreement under § 7. Section 7(a)(i) and (ii) provides that, in the event of a material breach or default in the performance of the agreement by either WPC or SGM, the non-breaching party "may terminate" the agreement upon notice to the breaching party, subject to that party's right to remedy the breach or default within sixty days.

In December 1987, with WPC's consent, SGM assigned its rights and obligations under the marketing agreement to Colgate, a Delaware corporation. Pursuant to the assignment, WPC, Colgate, and SGM signed a consent agreement, titled "WPC Consent to Assignment," which contains a provision modifying the term of the marketing agreement by adding another termination event. According to § 4(c) of the consent to assignment, the term of the marketing agreement would "expire upon payment to WPC by [SGM] and [Colgate] of aggregate royalties payable under the Agreement in addition to the other circumstances referred to in the definition of the 'Term' in § 2(b)(iv) of the Agreement." Section 2(b)(iv) is the option purchase provision, and the parties agree that "aggregate royalties" are $5 million. On January 18, 1988, Colgate entered into a distributorship agreement with its wholly owned subsidiary, SoftSoap Enterprises, a Minnesota Corporation, whereby SoftSoap assumed Colgate's obligations under the marketing agreement.

WPC filed suit against Colgate and SoftSoap on January 24, 1991, alleging that both defendants had breached the marketing

---

**2.** In addition to the presidents of WPC and SGM, the president of Twin Oak Products, Inc., the third-party guarantor under § 2(b)(ii), signed the marketing agreement.

agreement by failing to use their best efforts to market and distribute Disposer Care (count I), and that Colgate had misrepresented its marketing plan to WPC and was liable under either a negligence (count II) or strict responsibility theory (count III). Colgate and SoftSoap answered the complaint, and Colgate moved to dismiss the misrepresentation counts for failure to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). By order dated August 12, 1991, the district court granted the motion. SoftSoap continued to market and distribute Disposer Care for the remainder of 1991. On December 11, when WPC had received just over $1.5 million in royalty payments under the agreement, SoftSoap gave WPC written notice of its intention to stop marketing Disposer Care as of December 31. On that date, SoftSoap ceased performance under the agreement and returned the product to WPC.

Based on SoftSoap's actions, WPC sought and was granted leave to file an amended complaint. WPC deleted the misrepresentation counts and replaced them with a second breach of contract claim. This new count II alleged that Colgate and SoftSoap had terminated the marketing agreement by refusing to market and distribute Disposer Care before WPC had received $5 million in royalties. The defendants answered the amended complaint and moved for summary judgment on both the breach of contract/best efforts and breach of contract/termination counts, arguing that they had fulfilled their obligations to WPC under the agreement by insuring that WPC had been paid $1.5 million in royalties. In March 1992, WPC filed a cross-motion for summary judgment on the breach of contract/termination claim. On July 27, the district granted the defendants' motion;[3] final judgment dismissing WPC's complaint was entered the same day.

## II.

■ We turn first to our jurisdiction. Federal Rule of Appellate Procedure 3(c) provides:

The notice of appeal shall specify the party or parties taking the appeal; shall designate the judgment, order or part thereof appealed from; and shall name the court to which the appeal is taken.... An appeal shall not be dismissed for informality of form or title of the notice of appeal.

Colgate and SoftSoap point out that WPC's notice of appeal mentions only the district court's order dated July 27, 1992, without mentioning the August 12, 1991 order that dismissed WPC's misrepresentation claims.[4] The defendants argue that WPC's notice of appeal is defective and, as a result, this court lacks subject matter jurisdiction to review the August 12 order. They rely on *Torres v. Oakland Scavenger Co.*, 487 U.S. 312, 108 S.Ct. 2405, 101 L.Ed.2d 285 (1988), and certain of our decisions that have followed *Torres*. See *Leahy v. Board of Trustees of Community College*, 912 F.2d 917 (7th Cir.1990); *Brandt v. Schal Associates, Inc.*, 854 F.2d 948 (7th Cir.1988).

■ We adhere to the general principle that the rules of procedure, including Federal Rule of Appellate Procedure 3, will be liberally construed. *Smith v. Barry,* —— U.S. ——, ——, 112 S.Ct. 678, 681, 116 L.Ed.2d 678 (1992); *Torres,* 487 U.S. at 317, 108 S.Ct. at 2409; *Leahy,* 912 F.2d at 923. "Thus, if a litigant files papers in a fashion that is technically at variance with the letter of a procedural rule, a court may nonetheless find that the litigant has complied with the rule if the litigant's action is the functional equivalent of what the rule requires." *Torres,* 487 U.S. at 316–17, 108 S.Ct. at 2408–09. We bear in mind, however, that "Rule 3's dictates are jurisdictional in nature, and their satisfaction is a prerequisite to appellate review"; thus noncompliance with the rule is fatal to an appeal. *Smith,* —— U.S. at ——, 112 S.Ct. at 682.

*Torres* held that, under Rule 3's provisions, an appellant's inadvertent failure to include his own name on a notice of appeal deprives

---

3. The district court did not specifically address WPC's cross-motion for summary judgment. However, the effect of its decision was to deny the motion.

4. The notice states that WPC "appeals ... from the Order granting defendants judgment dismissing plaintiff's complaint, entered in this action on the 27th day of July, 1992."

the court of jurisdiction over the appeal. 487 U.S. at 317, 108 S.Ct. at 2409. That case bears some resemblance to the case at hand, but we find that *Foman v. Davis*, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962), is a better match. In *Foman*, the appellant failed to specify the precise judgment of the district court being appealed, designating in his notice of appeal an order denying the motion to amend the judgment rather than the judgment itself. The Court found that the defect could be overlooked so long as the faulty notice "did not mislead or prejudice" the appellee. *Id.* at 181, 83 S.Ct. at 229. Because the appellant's "intention to seek review of [the final judgment] . . . was manifest," the Court concluded that the technicality could be disregarded. *Id.*

As we have previously recognized, *Foman* is still good law after *Torres:*

> Although [*Torres*] construed *Foman* as finding that the particular notice of appeal complied with the rules, not as excusing noncompliance, see [487 U.S. at 315] 108 S.Ct. [at] 2408, the two come to the same thing when dealing with the [judgment-designation] clause of Rule 3(c). Moreover, because there may be one or many appellees, but only one final judgment per case, it makes sense to treat the first two clauses of the Rule differently. . . . Because the single final judgment incorporates earlier interlocutory decisions, any notice of appeal necessarily brings up *the case* in a way a notice of appeal need not present all parties.

*Chaka v. Lane*, 894 F.2d 923, 924–25 (7th Cir.1990).

5. Because we find that WPC's notice was the functional equivalent of what Rule 3 literally requires, this case is distinct from our decisions in *Leahy*, 912 F.2d at 923–24, and *Brandt*, 854 F.2d at 954, both of which involved noncompliance with the Rule. In *Leahy*, the plaintiff filed a notice of appeal from the district court's final order dismissing his case on the merits. At the time of filing, a defendant's motion for attorney's fees and costs under Fed.R.Civ.P. 11 was pending before the district court. Although the motion was subsequently granted in part, the plaintiff never filed an amended or second notice of appeal from the Rule 11 order. *Id.* at 920–21, 923. We held that the plaintiff, whose counsel "ha[d] demonstrated a propensity for procedural

Accordingly, we have followed the reasoning of *Foman* on numerous occasions, *Cook v. Navistar International Transportation Corp.*, 940 F.2d 207, 211 (7th Cir.1991); *Chaka*, 894 F.2d at 924–25; *Cardoza v. CFTC*, 768 F.2d 1542, 1546 (7th Cir.1985), none of which Colgate and SoftSoap cite. In *Cardoza*, we held that "an error designating the judgment or a part thereof will not result in a loss of appeal if the intent to appeal from the judgment complained of may be inferred from the notice and if the appellee has not been misled by the defect." 768 F.2d at 1546.

■ We find that WPC's intent to appeal from the August 12 order may be inferred from its notice of appeal and, consequently, that the notice was "the functional equivalent of what the rule requires" under *Torres*, 487 U.S. at 317, 108 S.Ct. at 2409.[5] After the August 12 order dismissing the misrepresentation claims, WPC amended its complaint to eliminate those claims, replacing them with the breach of contract/termination claim. By amending the complaint, WPC did not waive any challenge to the district court's dismissal of the misrepresentation claims for "[i]f a district court's dismissal leaves a plaintiff free to file an amended complaint, the dismissal is not considered a final appealable order." *Ordower v. Feldman*, 826 F.2d 1569, 1572 (7th Cir.1987). *See also Bastian v. Petren Resources Corp.*, 892 F.2d 680, 682 (7th Cir.), *cert. denied*, 496 U.S. 906, 110 S.Ct. 2590, 110 L.Ed.2d 270 (1990); *Hatch v. Lane*, 854 F.2d 981, 982 (7th Cir.1988) (per curiam). Moreover, despite the amendment, the factual allegations on which those claims were based remained in the complaint.

error both at the district court level and on appeal," had failed to comply with the prerequisites of Rule 3(c) and had not "taken any steps which might be considered the functional equivalent of what Rule 3 requires." *Id.* at 923.

In *Brandt*, we found that neither the plaintiff's notice of appeal nor his statement of issues to be raised on appeal, filed with the district court pursuant to Fed.Rule App.P. 10(b)(3), "mention[ed] any intention to appeal from the district court's order of voluntary dismissal" of certain defendants. 854 F.2d at 954. We concluded that "[t]his is hardly a case where the appellant merely failed to comply with the technicalities of compliance." *Id.*

■ WPC's notice of appeal, while not referencing the August 1991 order, did state that appeal was being taken from the July 1992 order "granting defendants judgment dismissing plaintiff's complaint." Ordinarily, an appeal from a final judgment brings up for review all previous orders entered in the case. *Asset Allocation & Management Co. v. Western Employers Insurance Co.,* 892 F.2d 566, 569 (7th Cir.1989); *United States v. Patel,* 835 F.2d 708, 710 (7th Cir.1987). We conclude that, by appealing the order resulting in dismissal of the complaint and final judgment for the defendants, WPC sufficiently demonstrated its intention to appeal all orders previously issued by the district court.

■ Rule 3(c) is broad enough to permit "an effective, although inept, attempt to appeal from the judgment sought to be" reversed. *Foman,* 371 U.S. at 181, 83 S.Ct. at 229. This is especially true where WPC was not free to appeal the dismissal of its misrepresentation claims before final judgment was entered on the contract claims. More important, though, Colgate and SoftSoap do not, and cannot, argue that they were prejudiced by the defect in WPC's notice of appeal. The defendants fully briefed and argued the merits of the August 1991 order; there is no hint of unfair surprise. *See Foman,* 371 U.S. at 181, 83 S.Ct. at 229–30; *Cook,* 940 F.2d at 211; *Management Computer Services, Inc. v. Hawkins, Ash, Baptie & Co.,* 883 F.2d 48, 49 n. 1 (7th Cir.1989); *Duran v. Elrod,* 713 F.2d 292, 295 (7th Cir.1983), *cert. denied,* 465 U.S. 1108, 104 S.Ct. 1615, 80 L.Ed.2d 143 (1984); *Gooding v. Warner–Lambert Co.,* 744 F.2d 354, 357 n. 4 (3d Cir.1984). WPC's notice of appeal effectively brings up both the August 1991 and July 1992 orders of the district court.

### III.

Turning to the August 1991 order, WPC argues that the district court erred in dismissing its negligent and strict responsibility misrepresentation claims. Before the district court, and in its brief to this court, WPC asserted that its "misrepresentation claims are straightforward examples of fraud in the inducement. Colgate misrepresented that it would launch a national advertising and marketing campaign and use its substantial financial resources and experience if Wisconsin Pharmacal consented" to the assignment of obligations from SGM to Colgate. According to WPC, no national campaign ever materialized; instead, soon after the assignment, Colgate turned the Disposer Care marketing program over to its underfinanced subsidiary, SoftSoap. WPC concludes from this that Colgate, at the time of the assignment, had no intention of following through on the representations it made to WPC.

We review *de novo* the district court's decision to dismiss the misrepresentation portions of WPC's complaint, accepting the truth of all well-pleaded factual allegations and drawing all reasonable inferences in WPC's favor. *Midwest Grinding Co., Inc. v. Spitz,* 976 F.2d 1016, 1019 (7th Cir.1992). The district court determined that Wisconsin law applied to this case. The parties have briefed, and we will apply, the substantive law of that state. In so doing, we conclude that dismissal was proper.

■ First, WPC's choice of the phrase "fraud in the inducement" is misleading. Fraud requires an intentional misrepresentation; WPC's original complaint pleaded only negligent and strict responsibility misrepresentation.[6] Nevertheless, we agree with the

---

6. In its original complaint, WPC averred that [t]o gain WPC's consent [to the assignment], representatives of WPC met with representatives of Colgate in the fall of 1987 and Colgate represented to WPC that if WPC consented to the assignment of the Marketing Agreement to Colgate, then Colgate would launch a national advertising and marketing campaign using Colgate's substantial financial resources and experience.

The negligent misrepresentation count alleged that "Colgate negligently misrepresented to WPC

that it intended to conduct a national advertising and marketing campaign."

The strict responsibility misrepresentation count alleged that

Colgate misrepresented that it intended to conduct a national advertising and marketing campaign for Disposer Care, and Colgate made this representation from its personal knowledge and was so situated that Colgate had particular means of ascertaining its true advertising and marketing plans for Disposer Care and Colgate's position made possible complete

district court's conclusion that even under these theories WPC has failed to state a viable claim under Wisconsin law.

To state a claim for negligent misrepresentation, a party must establish five elements: (1) There must be a duty of care or a voluntary assumption of a duty; (2) The representation must be of a fact and made by the defendant; (3) The representation of fact must be untrue; (4) The plaintiff must believe such representation to be true and rely thereon to his damage; and (5) The defendant must have failed to exercise ordinary care in making the misrepresentation or in ascertaining the facts. *Schweiger v. Loewi & Co., Inc.*, 65 Wis.2d 56, 221 N.W.2d 882, 887 (1974). *See also Ollerman v. O'Rourke Co., Inc.*, 94 Wis.2d 17, 288 N.W.2d 95, 109 (1980); *Whipp v. Iverson*, 43 Wis.2d 166, 168 N.W.2d 201, 203–04 (1969).

■ In Wisconsin, strict responsibility for misrepresentation applies in situations where public opinion calls for placing the loss on the innocent defendant rather than on the innocent plaintiff. *Gauerke v. Rozga*, 112 Wis.2d 271, 332 N.W.2d 804, 808–09 (1983) (quoting Law Notes for Trial Judges in Wis. Jury Instructions—No. 2400, Misrepresentation: Bases for Liability and Damages). A claim under this theory has elements (2), (3), and (4) in common with negligent misrepresentation, but also requires that the misrepresentation be made on the defendant's personal knowledge or under circumstances in which he necessarily ought to have known the truth or untruth of the statement, and that the defendant have an economic interest in the transaction. *Whipp*, 168 N.W.2d at 203.

■ We agree with the district court that Wisconsin courts would not recognize a claim for negligent misrepresentation in this case. When two corporations, with the benefit of counsel, negotiate a commercial transaction at arms length, neither owes nor assumes a duty to disclose information to the other. *Cf. Kanack v. Kremski*, 96 Wis.2d 426, 291 N.W.2d 864, 866–68 (1980); *Ollerman*, 288 N.W.2d at 101; *Kamuchey v. Trzesniewski*, 8

Wis.2d 94, 98 N.W.2d 403, 405 (1959). The parties were not in a special relationship, and WPC does not claim that Colgate gave false or misleading responses to questions posed by WPC about the marketing agreement. *See Kanack*, 291 N.W.2d at 867–68. WPC has not persuaded us that, in the context of business dealings between sophisticated parties, Wisconsin law would impose a duty on each not to utter words negligently.

■ Even if we were to find that WPC had satisfied the duty element of negligent misrepresentation, its claim under that theory, as well as under a strict responsibility theory, would founder on the requirement that the alleged misrepresentation be one of fact. As WPC concedes, statements of fact ordinarily must relate to present or preexisting facts, not future ones. *Hartwig v. Bitter*, 29 Wis.2d 653, 139 N.W.2d 644, 646 (1966); *Consolidated Papers, Inc. v. Dorr–Oliver, Inc.*, 153 Wis.2d 589, 451 N.W.2d 456, 459 (Ct.App.1989), *rev. denied*, 457 N.W.2d 323 (Wis.1990); *United States Oil Co. v. Midwest Auto Care Services, Inc.*, 150 Wis.2d 80, 440 N.W.2d 825, 827 (Ct.App.1989). An unfulfilled promise or statement of future events cannot provide the basis of a misrepresentation claim, *Dresser Industries v. Gradall Co.*, 702 F.Supp. 726, 736 (E.D.Wis.1988) (applying Wisconsin law), *aff'd*, 965 F.2d 1442 (7th Cir.1992); expressions of judgment relating to quality are opinions that are likewise not actionable. *Consolidated Papers*, 451 N.W.2d at 459.

Nothing said by Colgate during its negotiations with WPC constituted a preexisting or present fact; rather, the alleged misrepresentations were promissory in nature, reflecting Colgate's future intent. In addition, we conclude that any statement by Colgate that its advertising and marketing campaign would be national in scope was a statement of opinion. Because negligent and strict responsibility misrepresentation both require a representation of present or pre-existing fact, *see Gauerke v. Rozga*, 332 N.W.2d at 807 n. 3; *Whipp*, 168 N.W.2d at 203; *Reda*, 426 N.W.2d at 102, and cannot be based on

knowledge of its advertising and marketing plans for Disposer Care and Colgate's statements fairly implied that it had complete knowledge.

expressions of opinion, WPC's attempt to state a claim under either theory must fail.[7]

■ Finally, we are chary of finding that WPC has stated either a negligent or strict responsibility misrepresentation claim for another, more fundamental, reason. This court recently recognized that

> there is now substantial evidence that Wisconsin would decline in all circumstances to allow a negligence suit for the recovery of only economic damages, even when there is no contractual relationship between the parties. "An increasing number of jurisdictions hold that tort law provides no remedy in a case in which the plaintiff is seeking to recover for a commercial loss rather than damage to person, property, or reputation."

*Midwest Knitting Mills, Inc. v. United States*, 950 F.2d 1295, 1300 (7th Cir.1991) (footnote and citations omitted). In *Midwest Knitting*, a review of our cases construing Wisconsin case law led us to conclude that

> whatever ambiguity might remain about the existence of a tort cause of action for economic injury alone in the total absence of a contractual relationship, it is clear that Wisconsin would not permit such a cause of action when the parties have a contractual relationship and the injury is based on that relationship.

*Id.* at 1300–01.

We perceive no reason to deviate from this conclusion in the case before us, nor do we believe that Wisconsin courts would do so. WPC's dispute with Colgate is a commercial one arising from a contractual relationship. "[T]ort law is a superfluous and inapt tool for resolving purely commercial disputes. We have a body of law designed for such disputes. It is called contract law." *Miller v. United States Steel Corp.*, 902 F.2d 573, 574 (7th Cir.1990). The district court properly dismissed WPC's claims for negligent and strict responsibility misrepresentation under Fed.R.Civ.P. 12(b)(6).

## IV.

■ We next consider WPC's breach of contract claims. The district court found that Colgate's default in performance terminated the marketing agreement but that, according to the unambiguous terms of the agreement, "in the event of a default Colgate was required to pay at least $1.5 million in royalties." Because Colgate had already paid slightly more than that amount to WPC, the court concluded that Colgate had fulfilled its obligations under the agreement. This ruling necessarily rejected WPC's cross-motion for summary judgment on the breach of contract/termination claim, and disposed of the breach of contract/best efforts issue inasmuch as any breach resulting from Colgate's and SoftSoap's failure to use their best efforts to market and sell Disposer Care would presumably trigger the same provision requiring payment of at least $1.5 million to WPC.[8]

---

7. In Wisconsin law, an exception to the "pre-existing" fact rule exists where the promisor, at the time the promise or representation was made, had a present intention not to perform. *Hartwig*, 139 N.W.2d at 647. While some cases have touched upon this exception in the context of claims for negligent and strict responsibility misrepresentation, *see, e.g., Consolidated Papers*, 451 N.W.2d at 459; *United States Oil Co.*, 440 N.W.2d at 827–28, it would appear that if one making representations had a present intention not to perform them, the aggrieved party's claim would properly and logically be one for intentional misrepresentation. *See Lundin v. Shimanski*, 124 Wis.2d 175, 368 N.W.2d 676, 679, 684–85 (1985); *Hartwig*, 139 N.W.2d at 646; *Zingale v. Mills Novelty Co.*, 244 Wis. 144, 11 N.W.2d 644, 646–47 (1943); *Alropa Corp. v. Flatley*, 226 Wis. 561, 277 N.W. 108, 110 (1938).

Accordingly, if, as WPC attempts to argue, Colgate had no intention of launching a national advertising campaign or putting its full financial resources behind Disposer Care at the time of its statements to WPC, this would support a claim for intentional misrepresentation, not one based on negligence.

8. The district court's July 1992 order does not specifically address WPC's breach of contract/best efforts claim, focusing instead on the issue of termination. However, our interpretation of that court's disposition of the best efforts issue is consistent with the arguments advanced by Colgate and SoftSoap in this case. In its Reply Memorandum of Law in Support of Defendants' Motion for Summary Judgment, Colgate and SoftSoap argued that "[d]efault includes failure to use best efforts. Therefore[,] even if defendants did not use their best efforts, that failure would constitute a default under the Agreement, and $1.5 million would be the measure of damages." The same argument is made to this court.

The parties agree that the marketing agreement's provisions are clear and unambiguous, but attach vastly different meanings to the same contractual terms. WPC challenges the district court's decision, arguing that the court misconstrued the contract by reading into it a limitation on damages that did not exist. On the other hand, of course, Colgate and SoftSoap believe the district court got it right. They contend that the marketing agreement allows for termination once $1.5 million in royalties has been paid to WPC. They admit they defaulted in their performance and thus terminated the agreement, but insist that any and all damages due have been paid to WPC. We review *de novo* the district court's grant of summary judgment for the defendants, viewing the record and all reasonable inferences drawn from it in the light most favorable to WPC. *McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 370 (7th Cir.1992). Under this familiar standard, we conclude that the district court should not have granted summary judgment for the defendants.

As the district court recognized, the marketing agreement's original term was defined by three possible events: expiration of the patent, purchase of the product by Colgate for $5 million less royalties previously paid, or termination under § 7. At the time SGM assigned its obligations under the agreement to Colgate, SGM, WPC, and Colgate entered into the consent to assignment that modified the marketing agreement's term. The district court found, and the parties agree, that the consent to assignment added a fourth termination event. Under the consent to assignment, the marketing agreement would end upon WPC's receipt of "aggregate royalties" payable under the agreement. The district court found, and the parties agree, that aggregate royalties are $5 million.

The consent to assignment altered the original term of the marketing agreement in an important respect. Prior to the consent to assignment, the agreement provided that royalty payments would continue until WPC received $5 million from SGM. Once the $5 million figure was reached, royalty payments would cease, but, unless SGM purchased Disposer Care, the marketing agreement would otherwise remain in effect. After the consent to assignment, Colgate had no further obligations once $5 million in royalties had been paid to WPC.

The district court held that, notwithstanding the consent to assignment, the marketing agreement "also has a provision in Section 2(b)(ii) setting forth a guaranty of the minimum royalties which must be paid under all circumstances." The court treated this section as a liquidated damages provision; Colgate and SoftSoap ask us to do the same.

■ The construction of a written contract is a question of law. *Jones v. Jenkins*, 88 Wis.2d 712, 277 N.W.2d 815, 819 (1979); *Ford Motor Co. v. Lyons*, 137 Wis.2d 397, 405 N.W.2d 354, 379 (Ct.App.1987). In Wisconsin, "[t]he established rule is that the objective in interpreting and construing a contract is to ascertain the true intention of the parties." *Stradinger v. City of Whitewater*, 89 Wis.2d 19, 277 N.W.2d 827, 831 (1979). "[T]he purpose of judicial construction is to determine what the parties contracted to do as evidenced by the language they saw fit to use." *State ex rel. Journal/Sentinel v. Pleva*, 155 Wis.2d 704, 456 N.W.2d 359, 362 (1990). *See also Koenings v. Joseph Schlitz Brewing Co.*, 126 Wis.2d 349, 377 N.W.2d 593, 602 (1985). Thus, where the terms of a contract are plain and unambiguous, it is our duty to construe the contract as its stands, even though the parties may have placed a different construction on it. *Algrem v. Nowlan*, 37 Wis.2d 70, 154 N.W.2d 217, 221 (1967); *Dykstra v. Arthur G. McKee & Co.*, 92 Wis.2d 17, 284 N.W.2d 692, 702–03 (Ct.App. 1979), *aff'd*, 100 Wis.2d 120, 301 N.W.2d 201 (1981).

Section 2(b)(ii), the provision of the marketing agreement relied upon by the district court, provides that Colgate shall pay WPC, and Twin Oak shall guarantee, $1.5 million in royalties "regardless of whether [Colgate] continues to sell Product or utilize the Trademark unless Colgate is prohibited from selling the Product. The unpaid portion of such guaranteed minimum royalties shall become immediately due and payable in the event of a default by [Colgate] hereunder or termination of this Agreement."

According to WPC, § 2(b)(ii) was drafted as a third-party guarantee clause, intended to secure for WPC both an immediate return on its investment in developing a new product and a portion of expected royalties from sales of that product. Colgate and SoftSoap do not dispute this explanation of the provision; rather, they contend that the provision plainly limits WPC's damages to $1.5 million in the event of default or termination of the marketing agreement. They are wrong.

By its terms, § 2(b)(ii) requires Twin Oak to guarantee Colgate's payment of *"minimum* royalties" of $1.5 million to WPC upon Colgate's default (emphasis added). This section, however, says nothing about the *maximum* amount of money to which WPC would be entitled, or that Colgate would be required to pay, in the event of Colgate's breach. It may be, as counsel for Colgate and SoftSoap suggested at oral argument, that a liquidated damages clause need not be denominated as such, but the defendants have presented no evidence, other than the provision itself, either to support their position or to controvert WPC's claim that § 2(b)(ii) was intended to guarantee payment of the first $1.5 million in royalties by a third party, Twin Oak.

Because we interpret contracts according to their unambiguous terms, we must give the adjective "minimum" its plain and ordinary meaning rather than read it out of § 2(b)(ii) altogether. Thus we find not, as Colgate and SoftSoap would have it, that § 2(b)(ii) places an express limitation on WPC's damages upon default and termination of the marketing agreement, but that this provision unambiguously guarantees WPC at least $1.5 million in such an event. The provision contains no language to the effect that $1.5 million is the full measure of damages available to WPC under the circumstances, and we will not import such a limitation into the agreement.

This interpretation of § 2(b)(ii) is consistent with the marketing agreement as a whole, including the terms added by the consent to assignment. Section 2(b)(ii) appears under "Royalties" (itself a subheading under "Grant of License"), rather than under "Termination," which is covered in § 7. The only provision in § 7 specifically addressing the issue of damages in the event of breach is § 7(d), "Remedies," which states that "[t]ermination of this Agreement shall not preclude either party from seeking damages for breach or default under this Agreement." Interpreting § 2(b)(ii) as the parties' attempt to predetermine the limit on WPC's damages in the event of a breach by Colgate and SoftSoap would render § 7(d) largely superfluous.

Indeed, if § 2(b)(ii) was intended by the parties to settle all questions as to WPC's damages as the non-breaching party, a subsequent provision reserving WPC's right to seek damages in the event of default would make little sense. Mindful of the maxim that an agreement must be interpreted as a whole and all parts harmonized as far as possible so that no part is rendered surplusage, *Pleva,* 456 N.W.2d at 362; *Koenings,* 377 N.W.2d at 602; *Peiffer v. Allstate Insurance Co.,* 51 Wis.2d 329, 187 N.W.2d 182, 185 (1971); *Marion v. Orson's Camera Centers, Inc.,* 29 Wis.2d 339, 138 N.W.2d 733, 735 (1966), we conclude that § 2(b)(ii) does not evidence an intent to liquidate, or otherwise set a contractual ceiling on, WPC's damages.[9]

Finally, the terms of the consent to assignment belie Colgate's claim that the amount stipulated in § 2(b)(ii) was intended by the parties as the sole remedy in the event Colgate defaulted on and terminated the agreement. At the time of the assignment from SGM to Colgate, Colgate specifically negotiated to have the marketing agreement end once $5 million in royalties were paid to WPC. A provision to this effect, § 4(c), was

---

9. Another provision of the marketing agreement indirectly references WPC's right to seek damages in the event of Colgate's default, reinforcing the view that § 2(b)(ii) was not intended as a liquidated damages provision. Section 7(a)(ii) states, in part:

[I]n the event that [Colgate's] breach is for nonpayment of any amounts due WPC and

such nonpayment continues for a period of 30 days after notice by WPC to [Colgate] that such payment has not been received, WPC may, at its option, ... immediately terminate this Agreement.

As noted, § 7(d) expressly reserves WPC's right to seek damages when termination is the result of Colgate's default.

included in the consent to assignment drafted by Colgate. If, as Colgate and SoftSoap now claim, § 2(b)(ii) permitted them all along to terminate the marketing agreement with impunity after $1.5 million had been paid to WPC, the inclusion of a provision requiring termination once $5 million had been paid would appear to serve no purpose. Colgate's efforts to escape the implications of its own draftsmanship are unavailing.

As they concede, SoftSoap and Colgate terminated the marketing agreement on December 31, 1991 when they ceased to sell Disposer Care and returned the product to WPC. WPC did not consent to the termination; it brought suit pursuant to § 7(d). In its cross-motion for summary judgment, WPC argued that Colgate and SoftSoap had improperly terminated the marketing agreement and asked the district court to award damages equal to the difference between the amount of royalties WPC had received and $5 million.

Wisconsin courts follow the general rule that

> [t]he fundamental basis for an award of damages for breach of contract is just compensation for losses necessarily flowing from the breach. It is a corollary of this rule that a party whose contract has been breached is not entitled to be placed in a better position because of the breach than he would have been had the contract been performed.

*Dehnart v. Waukesha Brewing Co.*, 21 Wis.2d 583, 124 N.W.2d 664, 670 (1963) (citations omitted). *See also Handicapped Children's Education Board v. Lukaszewski*, 112 Wis.2d 197, 332 N.W.2d 774, 778 (1983); *Pleasure Time, Inc. v. Kuss*, 78 Wis.2d 373, 254 N.W.2d 463, 469 (1977); *Hanz Trucking, Inc. v. Harris Bros. Co., Crestline Div.*, 29 Wis.2d 254, 138 N.W.2d 238, 246 (1965).

The amount of royalties WPC would have received had Colgate and SoftSoap performed under the marketing agreement cannot be determined from the record before us. It is possible that, absent default by the defendants, the term of the agreement could have ended with the expiration of the patent even though WPC had not received aggregate royalties of $5 million. Consequently,

while we find that § 2(b)(ii) is not a liquidated damages clause and thus does not necessarily limit WPC's damages to the $1.5 million in royalties already paid by Colgate, the amount of those damages is a factual issue which must be determined on remand.

## V.

The August 12, 1991 order of the district court dismissing WPC's claims for negligent and strict responsibility is AFFIRMED. That portion of the July 27, 1992 order granting Colgate's and SoftSoap's motion for summary judgment on the breach of contract/termination claim is REVERSED. WPC's cross-motion for summary judgment is REMANDED with directions to the district court to enter judgment in favor of WPC on the issue of wrongful termination, and to determine the amount of damages due WPC on that claim. Because of its disposition of the breach of contract/termination claim, the district court did not address WPC's breach of contract/best efforts claim. We therefore express no opinion on that issue except to say that WPC may renew it on remand.